## FELDMAN *v.* UNITED STATES.

No. 193. Argued December 17, 1943.—Decided May 29, 1944.

*Mr. Seymour M. Klein,* with whom *Mr. James Marshall* was on the brief, for petitioner.

*Mr. Chester T. Lane,* with whom *Solicitor General Fahy, Assistant Attorney General Tom C. Clark,* and *Mr. Edward G. Jennings* were on the brief, for the United States.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is an indictment under Section 215 of the Criminal Code, 18 U. S. C. § 338, for using the mails to further a fraudulent scheme. Petitioner's conviction was affirmed

by the Circuit Court of Appeals, one judge dissenting. 136 F. 2d 394. We brought the case here, 320 U. S. 724, to consider the single question whether the admission of testimony previously given by petitioner in supplementary proceedings in a state court deprived him of the protection of the Fifth Amendment against being "compelled in any criminal case to be a witness against himself."

In accordance with New York procedure, known as supplementary proceedings, designed to aid in the discovery of assets of a debtor, N. Y. Civil Practice Act, art. 45, Feldman, a judgment debtor, was called as a witness in such proceedings on several occasions between March 31, 1936, and September 29, 1939. Up to March 14, 1938, the New York immunity statute merely provided that a debtor might not be excused from testifying because of self-crimination but that his testimony could not be used in evidence in a subsequent criminal proceeding against him. N. Y. Laws, 1935, c. 630, § 789. By an Act of March 14, 1938, New York broadened the debtor's immunity so as to free him from prosecution on account of any matter revealed in his testimony. N. Y. Laws, 1938, c. 108, § 17; N. Y. Civil Practice Act, § 789. While the earlier provision was in effect, Feldman testified that he was unemployed, paid rent of $250 a month from funds supplied by his family, owed about $340,000 and contemplated immediate bankruptcy. He further testified that about once a month his father sent him a book of signed checks, he sent large sums of money to his father by Western Union and destroyed whatever evidence the receipts might offer—in short, that he was "kiting" his father's checks by sending the proceeds of the later checks to cover those cashed earlier. After March 14, 1938, and down through September, 1939, Feldman again testified in New York supplementary proceedings, giving further details of his bizarre "kiting" practices.

The federal charge was the use of the mails in a scheme to defraud executed by "kiting" checks. In the trial, the Government introduced Feldman's testimony in the New York supplementary proceedings. He did not take the stand. The Government contends that it is unnecessary to decide whether the claim of privilege duly made bars the admission of this testimony. It suggests that testimony given prior to the Act of March 14, 1938, was not compellable and therefore Feldman waived any privilege, in that the New York statute prior to March 14, 1938, did not grant an immunity coextensive with the privilege available under New York law. *People ex rel. Lewisohn* v. *O'Brien,* 176 N. Y. 253, 68 N. E. 353. As to testimony under the later New York statute, the Government suggests that it either was not incriminating or was merely repetitive of the earlier voluntary testimony, making its admission in any event not prejudicial.

We put to one side all these subtler issues because we think they cannot dispose of the case. And so we come directly to the main question, namely whether the Fifth Amendment prohibited the admission against Feldman upon his trial in a federal court of the earlier testimony given by him in the state courts. While the point has not been formally decided, we deem the answer to be controlled by a long series of decisions expressing basic principles of our federation.

The effective enforcement of a well-designed penal code is of course indispensable for social security. But the Bill of Rights was added to the original Constitution in the conviction that too high a price may be paid even for the unhampered enforcement of the criminal law and that, in its attainment, other social objects of a free society should not be sacrificed. We are immediately concerned with the Fourth and Fifth Amendments, intertwined as they are, and expressing as they do supplementing phases of the

same constitutional purpose—to maintain inviolate large areas of personal privacy. See *Boyd* v. *United States,* 116 U. S. 616, 630. "The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles [of the Fourth and Fifth Amendments] established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land." *Weeks* v. *United States,* 232 U. S. 383, 393. "We have already noticed the intimate relation between the two amendments. They throw great light on each other. For the 'unreasonable searches and seizures' condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment; and compelling a man 'in a criminal case to be a witness against himself,' which is condemned in the Fifth Amendment, throws light on the question as to what is an 'unreasonable search and seizure' within the meaning of the Fourth Amendment. And we have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself." *Boyd* v. *United States, supra,* at 633.

But for more than one hundred years, ever since *Barron* v. *Baltimore,* 7 Pet. 243, one of the settled principles of our Constitution has been that these Amendments protect only against invasion of civil liberties by the Government whose conduct they alone limit. *Brown* v. *Walker,* 161 U. S. 591, 606; *Jack* v. *Kansas,* 199 U. S. 372, 380; *Twining* v. *New Jersey,* 211 U. S. 78. Conversely, a State cannot by operating within its constitutional powers restrict the operations of the National Government within its sphere. The distinctive operations of the two governments within their respective spheres is basic to our federal constitutional system, howsoever complicated and

difficult the practical accommodations to it may be. The matter was put in classic terms in what Chief Justice Taft called "the great judgment," *Ponzi* v. *Fessenden,* 258 U. S. 254, 261, of Chief Justice Taney in *Ableman* v. *Booth,* 21 How. 506, 516: "the powers of the General Government, and of the State, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres. And the sphere of action appropriated to the United States is as far beyond the reach of the judicial process issued by a State judge of a State court, as if the line of division was traced by landmarks and monuments visible to the eye."

This principle has governed a series of decisions which for all practical purposes rule the present case. When this Court for the first time sustained an immunity statute as adequate, it rejected the argument that because federal immunity could not bar use in a state prosecution of testimony compelled in a federal court, the immunity falls short of the constitutional requirement. *Brown* v. *Walker, supra,* at 606. And when the reverse claim was made as to a state immunity statute, that a disclosure compelled in a state court could not assure immunity in a federal court, the argument was again rejected because "The state [anti-trust] statute could not, of course, prevent a prosecution of the same party under the United States [anti-trust] statute, and it could not prevent the testimony given by the party in the State proceeding from being used against the same person in a Federal court for a violation of the Federal statute, if it could be imagined that such prosecution would be instituted under such circumstances." *Jack* v. *Kansas, supra,* at 380. When the matter was here last it was thus summarized: "This court has held that immunity against state prosecution is not essential to the validity of federal statutes declaring that a witness shall not be excused from giving evidence on the

ground that it will incriminate him, and also that the lack of state power to give witnesses protection against federal prosecution does not defeat a state immunity statute. The principle established is that full and complete immunity against prosecution by the government compelling the witness to answer is equivalent to the protection furnished by the rule against compulsory self-incrimination." *United States* v. *Murdock,* 284 U. S. 141, 149.

And so, while evidence secured through unreasonable search and seizure by federal officials is inadmissible in a federal prosecution, *Weeks* v. *United States, supra; Gouled* v. *United States,* 255 U. S. 298; *Agnello* v. *United States,* 269 U. S. 20, incriminating documents so secured by state officials without participation by federal officials but turned over for their use are admissible in a federal prosecution. *Burdeau* v. *McDowell,* 256 U. S. 465. Relevant testimony is not barred from use in a criminal trial in a federal court unless wrongfully acquired by federal officials. "If knowledge of them [the facts] is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it . . ." *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, 392. This Court has refused to draw nice distinctions as to when wrongful acquisition of evidence by state agencies was also a federal enterprise. When a representative of the United States is a participant in the extortion of evidence or in its illicit acquisition, he is charged with exercising the authority of the United States. Evidence so secured may be regained, *Go-Bart Co.* v. *United States,* 282 U. S. 344, and its admission, after timely motion for its suppression, vitiates a conviction. *Byars* v. *United States,* 273 U. S. 28.

The Constitution prohibits an invasion of privacy only in proceedings over which the Government has control. There is no suggestion of complicity between Feldman's creditors and federal law-enforcing officers. The Govern-

ment here is not seeking to benefit by evidence which it extorted. It had no power either to compel testimony in the state court or to forestall such disclosure as a means of avoiding possible interference with the enforcement of the federal penal code. Whether testimony in a New York court should be compelled in exchange for immunity from prosecution under the penal laws of New York is for New York to say. For what purposes the United States may deem the disclosure of testimony more important than prosecution for federal crimes is for Congress to say. It has seen fit to make the exchange very sparingly. See *United States* v. *Monia,* 317 U. S. 424. Certainly it is not for New York to determine when, because it suits its local policy to employ testimonial compulsion, it will relieve from federal prosecution "for or on account of any transaction, matter or thing concerning which" a New York court may have seen fit to require testimony. Such would be the practical result of sustaining petitioner's claim. The immunity from prosecution, like the privilege against testifying which it supplants, pertains to a prosecution in the same jurisdiction. Otherwise the criminal law of the United States would be at the hazard of carelessness or connivance in some petty civil litigation in any state court, quite beyond the reach even of the most alert watchfulness by law officers of the Government. See *Nardone* v. *United States,* 308 U. S. 338.

Only a word need be said about the phrase of scepticism in *Jack* v. *Kansas, supra,* at 380, that it could hardly be imagined "that such prosecution would be instituted under such circumstances." The "prosecution" and the "circumstances" there referred to were a prosecution on the same facts for violation of the state and the federal anti-trust laws. But see *Fox* v. *Ohio,* 5 How. 410, 435; *United States* v. *Lanza,* 260 U. S. 377. The cautionary words in *Jack* v. *Kansas* in nowise qualified the principle of that and later cases as to the separateness in the operation of state and

federal criminal laws and state and federal immunity provisions. There are, as we have already seen, ample safeguards. If a federal agency were to use a state court as an instrument for compelling disclosures for federal purposes, the doctrine of the *Byars* case, *supra*, as well as that of *McNabb* v. *United States,* 318 U. S. 332, afford adequate resources against such an evasive disregard of the privilege against self-crimination. See *United States* v. *Saline Bank,* 1 Pet. 100; *United States* v. *McRae,* L. R. 3 Ch. App. 79. Nothing in this record brings either doctrine into play.

*Judgment affirmed.*

MR. JUSTICE MURPHY and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, dissenting:

In *Boyd* v. *United States,* this Court said that "any compulsory discovery by extorting the party's oath . . . is contrary to the principles of a free government. It is abhorrent . . . to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom." 116 U. S. 616, 631–632.[1] Unless the Court now is disavowing this belief, the use of testimony obtained by compulsory discovery to convict an accused must be con-

----

[1] And see *Jack* v. *Kansas,* 199 U. S. 372, where this Court disposed of an argument that a Kansas statute unconstitutionally compelled Jack to confess his violations of a federal criminal statute with the assertion that, "We do not believe . . . such evidence would be availed of by the Government for such purpose." *Id.,* 381–382. In an earlier case, *Brown* v. *Walker,* 161 U. S. 591, this Court thought that the likelihood that state prosecutors would use testimony compelled by the federal government was "so improbable that no reasonable man would suffer it to influence his conduct." *Id.,* 606–608. But see *Ensign* v. *Pennsylvania,* 227 U. S. 592.

sidered "shocking to the universal sense of justice" and "offensive to the common and fundamental ideas of fairness and right," and therefore, under past decisions of the Court, incompatible with Constitutional due process of law. *Betts* v. *Brady,* 316 U. S. 455, 462, 473. Or at least, even if the use of testimony extracted by compulsory discovery be held consistent with due process, adherence to the belief expressed by the *Boyd* case should require the Court to hold that, absent a conflicting Act of Congress, "a decent regard for the duty of courts as agencies of justice and custodians of liberty forbids that men should be convicted upon evidence" so obtained. *McNabb* v. *United States,* 318 U. S. 332, 347. But I do not base my dissent upon judicially defined concepts of procedural due process or upon judge-made rules of evidence. The Bill of Rights, proposed in 1789 by the First Congress convened under our Constitution, and quickly ratified by the States in 1791, declares in part that, "No person . . . shall be compelled in any Criminal Case to be a witness against himself." Amend. V, Constitution of the United States. Never since the Bill of Rights was adopted, until today, has this Court sustained a single conviction for a federal offense which rested on self-incriminatory testimony forced from the accused. I cannot agree to do so now.

Feldman was compelled to testify under oath in a creditors' compulsory discovery proceeding in a New York court conducted pursuant to a state statute which granted him immunity from state prosecution for any state crime he might be forced to confess. Had he refused to testify he could have been imprisoned. Over his objection, a transcript of his compelled testimony was used in the United States District Court to convict him of a federal crime. As the Fifth Amendment heretofore has been interpreted, Feldman's testimony could not have been used for this purpose had it been compelled by a federal

court rather than the state court.[2]  This would have been true whether the federal court proceeding had been non-criminal or criminal,[3] and whether Feldman had testified as a mere witness or as a defendant.[4]  Nor could his forced testimony have been used had it been compelled by federal officers outside of a court room; [5] by foreign detectives in a foreign country inquiring into commission of an offense against the United States committed on the high seas;[6] or by state officers interrogating a suspect for the purpose of enforcing a federal law.[7]  There is, then, no sanction in the precedents of this Court for viewing the Fifth Amendment's prohibition against compelled testimony with grudging eyes and reducing its scope to the narrowest plausible limits.  As the decisions reflect, the previously declared attitude of the Court toward this prohibition has been that it "must have a broad construction in favor of the right which it was intended to secure."  *Counselman* v. *Hitchcock,* 142 U. S. 547, 562; *McCarthy* v. *Arndstein,* 266 U. S. 34.

Today, however, the Court adopts a different approach to the task of construing the Fifth Amendment.  We are now told that under certain circumstances compelled testimony is purged of the fatal taint which the Fifth Amendment places upon it, and that an accused can be convicted

---

[2] *McCarthy* v. *Arndstein,* 266 U. S. 34; and see *Bram* v. *United States,* 168 U. S. 532; *Wan* v. *United States,* 266 U. S. 1; cf. *Boyd* v. *United States,* 116 U. S. 616.

[3] *McCarthy* v. *Arndstein, supra,* Note 2, pp. 40–41; *Counselman* v. *Hitchcock,* 142 U. S. 547, 562. See also *United States ex rel. Bilokumsky* v. *Tod,* 263 U. S. 149; *United States ex rel. Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103.

[4] *Counselman* v. *Hitchcock,* 142 U. S. 547.

[5] *Wan* v. *United States, supra,* Note 2; *Anderson* v. *United States,* 318 U. S. 350, 356.

[6] *Bram* v. *United States, supra,* Note 2.

[7] *Anderson* v. *United States, supra,* Note 5; and see *Bram* v. *United States, supra,* Note 2.

in a federal court on words he was forced to speak. The circumstances under which it is now held that men can be forced to convict themselves by their own testimony are, (1) that the testimony was compelled by state officers, and (2) that the state officers were not acting to enforce federal law. These slight variations in the techniques of compulsion are considered a sufficient excuse to escape the Fifth Am'endment's command against the use of compelled testimony by federal courts. Surely such a holding is not to be justified by the language of that Amendment. Within its sweeping prohibition are found no exceptions based upon the persons who compel, their purpose in compelling, or their method of compelling, whether by threats of imprisonment, physical torture, or other means. Testimony is no less compelled because a state rather than a federal officer compels it, or because the state officer appears to be primarily interested at the moment in enforcing a state rather than a federal law.

Nor is the holding in this case to be defended as one which our federal system requires. This case presents no conflict between federal and state spheres of power such as that presented by cases involving the validity of federal and state immunity statutes, wherein it has been contended, unsuccessfully, that neither the United States nor a State can compel a witness to testify against himself unless it grant him complete immunity from prosecution in both jurisdictions.[8] Feldman's objection to the use of

---

[8] See *Hale* v. *Henkel*, 201 U. S. 43, and *United States* v. *Murdock*, 284 U. S. 141, holding it enough that the United States grant immunity from prosecution for federal crimes; but see, *contra, United States* v. *Saline Bank*, 1 Pet. 100; *Ballmann* v. *Fagin*, 200 U. S. 186. Had the Court in the *Murdock* case, *supra*, accepted the contention that the federal government must grant an immunity from state as well as federal prosecution, it would inevitably have been faced with the problem of the federal power to interfere with enforcement of state laws through the device of granting immunity from state prosecution to witnesses in federal proceedings—a problem replete with both prac-

his compelled testimony is not based on a claim that New York must grant him, or has granted him, immunity from prosecution for the federal crime it has forced him to confess. He does not question the power of the United States to prosecute him for that crime on proper evidence. Nor, for that matter, does he contend that the Fifth Amendment prevented New York from compelling him to confess a federal crime.[9] He claims only that the Fifth Amendment's prohibition against self-incrimination prevents the use of his compelled testimony against him in the present proceeding. The very narrow problem thus presented, and upon which this Court never before has passed, is whether federal courts can convict a defendant of a federal crime by use of self-incriminatory testimony which someone in some manner has extracted from him against his will. The Court's holding that a defendant can be so convicted cuts into the very substance of the Fifth Amendment. And it justifies this result not by the language or history of the Constitution itself, but by a process of syllogistic reasoning based upon broad premises of "dual sovereignty" stated in previous opinions of the Court relating to immunity statutes. Even were there here a "dual

tical and legal difficulties. See J. A. C. Grant, Immunity From Compulsory Self-Incrimination in a Federal System of Government, 9 Temple L. Q. 57 and 194, 207–211.

Compare *Jack* v. *Kansas, supra,* Note 1, holding that Kansas could compel a witness to testify to his past crimes upon a grant of immunity from state prosecution, though he still be subject to federal prosecution. In reaching this result the Court took specific notice of the fact that, were the rule otherwise, state immunity statutes must all be stricken down. "The state statute could not, of course, prevent a prosecution of the same party under the United States statute." 199 U. S. 372, 380.

[9] See *Twining* v. *New Jersey,* 211 U. S. 78, and *Ensign* v. *Pennsylvania, supra,* Note 1, holding respectively that despite the Fourteenth Amendment a state may compel a defendant to incriminate himself, and may use against him schedules he filed in an involuntary federal bankruptcy proceeding. But see *Ashcraft* v. *Tennessee,* 322 U. S. 143.

sovereignty" problem, which there is not, such a method of decision would be questionable. Constitutional interpretation should involve more than dialectics. The great principles of liberty written in the Bill of Rights cannot safely be treated as imprisoned in walls of formal logic built upon vague abstractions found in the United States Reports. "The ultimate touchstone of constitutionality is the Constitution itself and not what we have said about it." *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, concurring opinion, 487, 491–492.[10]

Putting aside the Court's dialectical method of interpretation, and examining the history and purpose of the Fifth Amendment, there appears to be no justification for reducing its scope as the Court is now doing. Compulsion of self-incriminatory testimony by court oaths and by the less refined methods of torture were equally detested by the Fifth Amendment's liberty-loving advocates and their forbears.[11] Their abhorrence of these practices did not spring alone from a predilection for personal privacy. They had other reasons to despise and fear them. They still remembered the hated practices of the Court of Star Chamber, the Court of High Commission, and other inquisitorial agencies which had brought religious and political non-conformists within the penalties of the law by means of their own testimony. And history supports no argument that the framers of the Fifth Amendment were interested only in forbidding the *extraction* of an accused's testimony, as distinguished from the *use* of his extracted testimony. The extraction of testimony is, of course, but a means to the end of its use to punish. Few persons

---

[10] For a critical analysis of the conflict between the legal concept of "dual sovereignty" and preservation of the Constitutional prohibition against self-incrimination, see J. A. C. Grant, *op. cit., supra,* Note 8.

[11] See Pittman, The Colonial and Constitutional History of the Privilege Against Self-Incrimination in America, 21 Va. L. Rev. 763, 775–783.

would seriously object to testifying unless their testimony would subject them to future punishment. The real evil aimed at by the Fifth Amendment's flat prohibition against the compulsion of self-incriminatory testimony was that thought to inhere in using a man's compelled testimony to punish him. By broadly outlawing the practice of compelling such testimony the Fifth Amendment struck at this evil at its source, seeking to eliminate the possibility that compelled testimony would ever be available for use to punish a defendant.[12]

Perhaps, as some have argued, the men who framed this Amendment were mistaken or their fears have lost foundation and the unqualified prohibition against the extraction and use of compelled testimony which they put into the Fifth Amendment should be repealed or modified.[13] This view of the desirability of constricting the Fifth Amendment I am not ready to accept, but were it otherwise I would not consider such a view should play any part in the process of interpretation. I am unwilling to see any constriction of the liberties and the procedural safeguards of these liberties specifically enumerated in the Bill of Rights unless it be by Constitutional amendment.[14]

The prohibition against compelled testimony which the Court today has seen fit to restrict cannot be dissociated

---

[12] See *United States* v. *Burr*, 25 Fed. Cas. 38–41; *Counselman* v. *Hitchcock*, 142 U. S. 547, 564–566; *Brown* v. *Walker*, 161 U. S. 591, 594, 600, 605–606; cf. *Ex parte Lange*, 18 Wall. 163, 173. And see Pittman, *op. cit.*, *supra*, Note 11; and cases cited Notes 5, 6, and 7, *supra*.

[13] Compare Knox, Self-Incrimination, 74 Univ. Pa. L. Rev. 139 with VIII Wigmore on Evidence, Third Ed., pp. 304–313; and see Editorial, 16 Journ. Crim. Law and Crim. 165–166.

[14] See dissenting opinion of Circuit Judge Frank in *United States* v. *St. Pierre*, 132 F. 2d 837, 840, pp. 847–848. "Strangely enough, those who are most opposed to any changes in judicial constructions of those designedly elastic clauses of the Constitution are often the most vigorous in their demands that the courts should eviscerate the specific and relatively inelastic self-incrimination clause." *Id.*, 848.

from the other specific protections afforded the individual by the Bill of Rights. The founders of our federal government were too close to oppressions and persecutions of the unorthodox, the unpopular, and the less influential to trust even elected representatives with unlimited powers of control over the individual. From their distrust were derived the first ten amendments, designed as a whole to "limit and qualify the powers of Government," to define "cases in which the Government ought not to act, or to act only in a particular mode," and to protect unpopular minorities from oppressive majorities. 1 Annals 437. The first of the ten amendments erected a Constitutional shelter for the people's liberties of religion, speech, press, and assembly. This amendment reflects the faith that a good society is not static but advancing, and that the fullest possible interchange of ideas and beliefs is essential to attainment of this goal. The proponents of the First Amendment, committed to this faith, were determined that every American should possess an unrestrained freedom to express his views, however odious they might be to vested interests whose power they might challenge.

But these men were not satisfied that the First Amendment would make this right sufficiently secure. As they well knew, history teaches that attempted exercises of the freedoms of religion, speech, press, and assembly have been the commonest occasions for oppression and persecution. Inevitably such persecutions have involved secret arrests, unlawful detentions, forced confessions, secret trials, and arbitrary punishments under oppressive laws. Therefore it is not surprising that the men behind the First Amendment also insisted upon the Fifth, Sixth, and Eighth Amendments, designed to protect all individuals against arbitrary punishment by definite procedural provisions guaranteeing fair public trials by juries. They sought by these provisions to assure that no individual could be punished except according to "due process," by

which they certainly intended that no person could be punished except for a violation of definite and validly enacted laws of the land, and after a trial conducted in accordance with the specific procedural safeguards written in the Bill of Rights.[15] If occasionally these safeguards worked to the advantage of an ordinary criminal, that was a price they were willing to pay for the freedom they cherished. And one of the specific procedural safeguards which they inserted to shield the individual was the prohibition against compulsion of self-incriminatory testimony.

It is impossible for me to reconcile today's restrictive interpretation of the prohibition against compelled self-incrimination with the principle of broad construction which this Court heretofore has deemed essential to full preservation of the basic safeguards of liberty specifically enumerated in the Bill of Rights. The protections explicitly afforded the individual by the Bill of Rights represent a large part of the characteristics which distinguish free from totalitarian government. Under our Constitutional system the privileges it embodies and the rights it secures were intended to be above and beyond the power of any branch of government to mutilate or destroy. We have no assurance that the fears of those who drafted and adopted our Bill of Rights were groundless, nor that the reasons for those fears no longer exist. Ancient evils historically associated with the possession of unqualified power to impose criminal punishment on individuals have a dangerous habit of reappearing when tried safeguards are removed.

This case involves the Fifth, not the Fourth, Amendment. Decisions which have read the Fourth and Fifth Amendments together for the purpose of broadening the Fourth Amendment should not now be employed to narrow the Fifth Amendment. To do so ignores the particu-

---

[15] See *Chambers* v. *Florida*, 309 U. S. 227, 235–238; *Tot* v. *United States*, 319 U. S. 463, 473.

lar reasoning of these decisions as well as the separate language and history of the two Amendments. See *Boyd* v. *United States, supra; Counselman* v. *Hitchcock, supra; Brown* v. *Walker,* 161 U. S. 591; VIII Wigmore on Evidence, Third Ed. pp. 276–304, 368. Nothing this Court has said with regard to the Fourth Amendment requires that we now open the door which the Fifth Amendment in 1791 closed to compelled self-incrimination.

I would reverse the judgment.

MR. JUSTICE DOUGLAS and MR. JUSTICE RUTLEDGE join in this opinion.