Albert Lloyd **ANDERSEN,**
Appellant,

v.

**UNITED STATES** of America,
Appellee.

**No. 15053.**

United States Court of Appeals
Ninth Circuit.

Sept. 21, 1956.

Ralph Morgali, Charles Miles, Jr., Las Vegas, Nev., Albert M. Dreyer, Washington, D. C., for appellant.

Franklin P. R. Rittenhouse, U. S. Atty., Howard W. Babcock, Asst., U. S. Atty., Las Vegas, Nev., for appellee.

Before LEMMON, FEE and BARNES, Circuit Judges.

LEMMON, Circuit Judge.

"It is an old joke," the appellant's expert testified, and only semi-humorously, "that you have got to be a little nuts to be a psychiatrist.

"You got to be a little off to be a psychiatrist or you can't make a living any other way unless you are, and pretty near the same thing follows for a psychologist."

The appellant himself, however, who holds a Ph.D. in clinical psychology, disagreed with his expert witness.

"It isn't too good for a psychologist to be crazy," he said.

That remark might easily be classified as the understatement of the year.

On one occasion, in a movie, the appellant "began to feel like I was going to start crying". He hurried back to his office, where he put a pillow to his head so people in the building couldn't hear his sobs.

"Big boys don't cry," the appellant explained.

1. *Statement of the Case*

On September 29, 1955, there was filed against the appellant an indictment in two counts, charging him with violations of 18 U.S.C.A. § 474, *infra,* on or about August 1, 1955, at Las Vegas, Nevada.

Count One alleged that the appellant did "photograph, and print the likeness of, a genuine Fifty Dollar * * * United States Federal Reserve Note * * "

Count Two charged that he photographed and printed the likeness of a genuine $20 Federal Reserve Note.

Section 474, *supra,* provides for the punishment of any one who "prints, photographs, or in any other manner makes or executes any engraving, photograph,

print, or impression in the likeness of any such obligation or other security [of the United States], * * * except by direction of some proper officer of the United States".

The jury returned a verdict of guilty on both counts, and the appellant was sentenced to two years' imprisonment on each count, the sentences to run concurrently. From that judgment the present appeal has been taken.

The appellant made a motion in the court below to suppress as evidence the two Federal Reserve Notes mentioned above, "on the grounds that (1) said items were unlawfully seized and taken from Defendant's premises; and (2) the property seized is not that described in the warrant".

### 2. Statement of Facts on the Motion to Suppress

On the Motion to Suppress, the following salient evidence was adduced:

Armed with a search warrant and a warrant of arrest, Detective Sergeant Jack D. Ruggles, of the Las Vegas Police Department, entered the appellant's office premises some time after 4 p. m., September 22, 1955. He was accompanied by Policeman Herbert L. Barrett, of the same Department.

The doctor's office consisted of five rooms—a reception room, a private office, a treatment room, a utility room, and a darkroom. This last had "three or four different locks on it."

The appellant was not in his private office when the officers entered it. In a few minutes he came in and his visitors identified themselves. Sergeant Ruggles showed the appellant the warrant of arrest charging grand larceny, and also exhibited the warrant for search of the office premises and the appellant's home. Detective Ruggles testified that burglaries had been committed right across the hall from the appellant's office and the witness had "good reason to believe that Dr. Andersen had committed those burglaries". The warrant of arrest itself, however, was for the grand larceny of a camera.

When he was shown the two warrants and was told that he was under arrest, Dr. Andersen "said it was fantastic". He "became suddenly ill", and was "apparently very nervous".

"His face became flushed," the officer continued. "He was shaking outwardly —trembling * * * In fact, he said he felt sick.

"He requested me to allow him to lie down until he felt better and I told him he certainly could and so he took me around in this east room and got into this chair, and I began talking to him * * I asked him if he had stolen that camera that he was charged with stealing * * I asked him about the burglaries."

In the meantime, Sergeant Ruggles told Barrett to search the entire office premises for the articles listed in the search warrant. Shortly afterward, Barrett asked Ruggles to come into the other room, and "pointed out a plastic bag full of these notes and these printed up bills".

Sergeant Ruggles confronted the appellant with the bag and asked him where he had obtained it. The detective then plunged into the crucial part of his narrative, so far as the present case is concerned:

"He said he had been photographing money and transferring the photograph onto the money, which was his hobby, and I told him I didn't think it was legal as a hobby or any other respect to photograph money, so I ordered Detective Barret to further search the premises for any kind of equipment that he might use to make these photographs with, in addition to the things listed on the original warrant, and Detective Barrett stated there was a room back there that had three or four different locks on it and he couldn't get in.

"I requested Dr. Andersen to unlock it and he took out a set of keys and started to unlock it. He unlocked each of the locks and when the locks were off it was a darkroom approximately four feet by four feet.

It had a phone, a developing tray, all sorts of chemicals and things photographers would use.

"There was a large portrait camera. That was not in the darkroom. It was on a table outside the darkroom. Most of the stuff was in the room on the west side of the office. So we gathered up—we also found in the darkroom, as I remember, a small overnight bag or suitcase and we took it out and opened it and it had a leather case with several different compartments and in these compartments we found these negatives and bills that looked much better than the ones in the plastic bag. He said those in the plastic bag were those he had discarded. Those in the folder were better. Some had the bill printed on both sides and the colors were better. I mean that they began to look more like the real thing, to me, anyway. This overnight bag and the leather container had his initials on it. I asked him if it was his and he said yes, it was. That is where he put these negatives and the good bills.

\* \* \* \* \*

"He didn't object to opening up the darkroom and he didn't object to making the search at any time. I didn't ask him for permission, I admit, but he did not make any objection."

When the two police officers had gathered up the evidence and were ready to go, the thought occurred to Ruggles that there was no Secret Service agent in Las Vegas. He therefore telephoned to the FBI and "asked them to step over to the office \* \* \* that I wanted to inquire of them how to contact the nearest Secret Service agent." The FBI agents went to the appellant's office and told Ruggles that they had no authority in the case. They referred him to Agent Spaman, in Los Angeles. Ruggles further testified:

"The FBI gave me no instructions and they told me that they had no authority whatsoever, and they gave me no assistance whatsoever, and turned around and walked out."

Before leaving, however, Bryan C. Wheeler, a Special Agent of the FBI, told Ruggles that he would attempt to get the telephone number of the Secret Service in Los Angeles. After departing from the appellant's office, Wheeler did obtain that telephone number, "and called Detective Ruggles back". The FBI men were in the appellant's office for about four or five minutes, Wheeler testified.

W. Albert Stewart, Jr., the other FBI man, said their visit lasted "Not more than five minutes". Barrett's estimate of the duration was "not more than one minute", while that of Ruggles was "A very few minutes".

After the second telephone conversation, Ruggles and Barrett, the city detectives, took the appellee's exhibits, admitted in evidence, marked them for identification, and later turned them over to Howard M. Sweeney, a Secret Service agent stationed at Los Angeles. Agent Sweeney selected the photographs described in Counts One and Two for presentment to the grand jury. Sweeney got into the case because Frank Lava, whose name was given to Ruggles by Agent Wheeler, had been transferred and Ruggles "got a hold of" Sweeney instead.

Agent Sweeney first saw the appellant at about 6:30 p. m., on the evening of September 23, 1955, in the Las Vegas city jail.

3. *The Denial of the Appellant's Motion to Suppress and the Subsequent Admission of the Photographic Exhibits Were Proper.*

The first specified error is that "The Court erred in denying appellant's motion to suppress the evidence".

The appellant concedes that "ordinarily" the Fourth Amendment of the United States Constitution does not "prevent the introduction in Federal Courts of evidence obtained by unreasonable searches and seizures by state officers alone, which evidence is subsequently handed over to

the federal authorities on a silver platter".

"However," insists the appellant, "where federal agents had any part in the unlawful acquisition of the evidence by state officers it must be excluded in Federal Courts as against an accused".

(a) *The Doctrine of "The Silver Platter"*

We must inquire, therefore, what, under the decisions, amounts to a vitiating "part", contributed by Federal agents, "in the unlawful acquisition of the evidence by state officers". In other words, what is this thing, "participation"?

The doctrine of participation is thus expounded in the leading case of Lustig v. United States, 1949, 338 U.S. 74, 78–79, 69 S.Ct. 1372, 1374, 93 L.Ed. 1819, heavily relied upon—though we do not understand why—by the appellant himself:

"To differentiate between participation from the beginning of an illegal search and joining it before it had run its course, would be to draw too fine a line in the application of the prohibition of the Fourth Amendment as interpreted in Byars v. United States, supra, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520.

"The crux of that doctrine is that *a search is a search by a federal official if he had a hand in it;* it is not a search by a federal official *if evidence secured by state authorities is turned over to the federal authorities on a silver platter.* The decisive factor in determining the applicability of the Byars case is the *actuality* of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means. It is immaterial whether a federal agent originated the idea or joined in it *while the search was in progress. So long as he was in it before the object of the search was completely accomplished,* he must be deemed to have participated in it.

Where there is participation on the part of federal officers it is not necessary to consider what would be the result if the search had been *conducted* entirely by State officers. Evidence secured through such federal participation is inadmissible for the same considerations as those which made Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, the governing principle in federal prosecutions." [Emphasis supplied.]

Again, in Feldman v. United States, 1944, 322 U.S. 487, 492, 64 S.Ct. 1082, 1084, 88 L.Ed. 1408, the Court said:

"And so while evidence secured through unreasonable search and seizure by federal officials is inadmissible in a federal prosecution, [Cases cited], incriminating documents so secured by state officials without participation by federal officials *but turned over for their use* are admissible in a federal prosecution. [Case cited.] * * * 'If knowledge of them (the facts) is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it'. * * * This Court has refused to draw nice distinctions as to when wrongful *acquisition of evidence by state agencies* was also a federal enterprise. When a representative of the United States is a *participant* in the *extortion* of evidence or in its illicit *acquisition,* he is charged with exercising the authority of the United States. Evidence so secured may be regained, [case cited], and its admission, after timely motion for its suppression, vitiates a conviction. [Case cited.]

*"The Constitution prohibits an invasion of privacy only in proceedings over which the Government has control."* [Emphasis supplied.] [1]

---

1. See also Weeks v. United States, 1914, 232 U.S. 383, 398, 34 S.Ct. 341, 58 L.Ed. 652; Burdeau v. McDowell, 1921, 256 U.

S. 465, 475–476, 41 S.Ct. 574, 65 L.Ed. 1048; Brown v. United States, 9 Cir., 1926, 12 F.2d 926; Latimer v. Cranor,

## (b) *A Question of Monograms*

The appellant sedulously attempts to blow up acts of ordinary courtesy among peace officers representing different jurisdictions of government—State and federal—into active "co-operation" on the part of the Federal agents. The appellant's argument runs thus:

"Defendant relies upon the following: Prior to removing the evidence from the doctor's premises the federal officers were contacted; they came upon the doctor's premises; they saw the evidence relevant to the federal crime; they were asked by the state officers how they could get in touch with federal Treasury agents; the state officers were told by the federal officers that they would phone back the name of a federal Treasury agent with whom they could get in touch and who had jurisdiction of such peculiarly federal crimes; that prior to the state officers' effecting the completion of the seizure of the evidence by removing it from the doctor's premises, the federal officers, in cooperation with the state officers, called back the name of the federal officer; thereupon the state officers removed the evidence from the premises, took it to the City Jail, marked it for identification, locked it up, and the next evening turned it over to federal Treasury Agent Sweeney who responded to the call placed by [Police] Officer Ruggles to the federal official whose name and location were given by the federal officials to Officer Ruggles; federal Treasury Agent Sweeney selected from the evidence exhibits 1 and 2 upon which the indictment was brought against Doctor Andersen; the evidence found in the doctor's premises was later used to convict him."

Part of this verbose statement of the alleged Federal "co-operation" is, of course, wholly irrelevant. We refer to the latter portion, beginning with the clause, "thereupon the state officers removed the evidence," etc. Indeed, in the sentence immediately following the above excerpt from his brief, the appellant tacitly admits this irrelevance when he says:

"Defendant submits that federal co-operation clearly occurred *prior* to the effective seizure of the evidence through its removal by state officers from the premises." [Emphasis supplied.]

The rest of the appellant's statement, quoted above, contains half-truths and what newspapermen call "editorializing"; *i. e.,* expressions of opinion rather than simple and bald narrative. For example, the very first clause in the appellant's running account of what occurred after the city officers had collected the evidence contains an incomplete statement of fact: "Prior to removing the evidence from the doctor's premises," etc. What Ruggles actually testified was "After we had *gathered up the evidence and were ready to go,*" etc. In other words, *all the evidence had been collected by the city detectives* before any communication was had with Federal officers. There was no co-operation whatever with the latter in either the *seizure* or, as we have just seen, the *removal* of the evidence.

Furthermore, that statement that the federal officers would telephone back the name of a Treasury agent "who had *jurisdiction of such peculiarly federal crimes*" was not a quotation of any Federal officer, but pure editorializing on the part of the brief-writer.

9 Cir., 1954, 214 F.2d 926, 928; Williams v. United States, 9 Cir., 1954, 215 F.2d 695, 696; United States v. Butler, 10 Cir., 1946, 156 F.2d 897, 898; Gilbert v. United States, 10 Cir., 1947, 163 F.2d 325, 327; United States v. O'Brien, 7 Cir., 1949, 174 F.2d 341, 346; United States v. Braggs, 10 Cir., 1951, 189 F.2d 367, 369; Johnson v. United States, 5 Cir., 1953, 207 F.2d 314, 321, certiorari denied, 1954, 347 U.S. 938, 74 S.Ct. 632, 98 L.Ed. 1087; United States v. Haywood, 7 Cir., 1953, 208 F.2d 156, 158; United States v. Stirsman, 7 Cir., 1954, 212 F.2d 900, 903–905.

Again, the brief states that "the federal officers, *in co-operation with the state officers*, called back the name of the federal officer". [Emphasis supplied throughout.] Here again we have rank editorializing. The appellant seems bound to get that word "co-operation" in there, in season and out of season. Here was a case where Federal agents, as a matter of simple courtesy among law enforcement officers, telephoned to city detectives the name of another Federal officer. The city detectives could probably have obtained the same information from a Los Angeles city or telephone directory, or could have gotten into touch with the Los Angeles office of the Secret Service by dialing "Long Distance".

The appellant attempts to torture an act of ordinary courtesy, performed after *all the evidence had been "gathered up" by the city detectives*, into such Federal "co-operation" or "participation" as will taint the evidence with illegality in a Federal court.

The evidence had already been "gathered" by the city detectives. The sole question was this: Should it be deposited upon a "silver platter" bearing the monogram "FBI" or upon one engraved with the letters "SS"?

The denial of the appellant's motion to suppress the evidence and the subsequent admission of the photographic prints and negatives were proper. They did not violate the appellant's Constitutional rights.

4. *The District Judge Properly Exercised His Discretion in Ruling Upon the Manner in Which Expert Testimony Relating To Sanity Should Be Presented.*

The appellant specifies as error the District Court's refusal "to permit experts to testify as to appellant's mental condition unless they heard the evidence bearing on that subject which was given in open court."

In his brief, the appellant quotes at some length the Court's statement of its reasons for the ruling, in part as follows:

"Recalling to mind what Mr. Dreyer [of counsel for the appellant] stated, that he expected to have the witness [the appellant] on the stand for the balance of the afternoon, the defendant—and then tomorrow a doctor would appear hear [sic]—a qualified expert, and a hypothetical question would be propounded to him which would take about fifteen minutes to propound to him; well, I think that that is just what would happen because that question might be longer than that. However, the hypothetical question would call to the doctor's mind nothing except what was contained within it and the jury in the meantime wait and listen to all of the defendant's testimony. Then they are going to carry it with them into the jury room when and if they get this case—I don't know when it will be—when it comes time to consider this issue, and they are going to have in mind perhaps substantially all of the defendant's testimony. They are going to have in mind the opinion of the expert based upon what is in that question. It may be that an opinion of a conscientious expert, and I don't know of any doctors who are not conscientious, based upon what is in the question after that man has sat and listened to all of this might be a different opinion. What we want is the best opinion of a good qualified expert. That is why I decided upon this procedure, *that the expert must be present and here all the time the defendant is testifying and hear all the testimony that is on this issue*." [Emphasis supplied.]

The appellant's quotation from the Court statement ends here. Based upon this incomplete and misleading excerpt from the Court's pronouncement, there follows, several pages further on in the brief, the criticism that "the Court below committed manifest error in ruling *that only experts who had heard the evidence would be permitted to testify as to the*

*appellant's sanity."* [Emphasis supplied.]

Had the appellant pursued the quotation from the record for one sentence further, the fairness of the Court's ruling would have become manifest:

*"And we will go back and have what was in the record here repeated so the doctor will hear it."*

The appellee does not seem to have noticed this important omission.

Furthermore, the record plainly shows that counsel for the appellant *understood* that he was not to be limited to experts who had heard the appellant's testimony from the latter's own lips. Counsel said:

"If the order is to comply with the ruling of Your Honor I will attempt to have one or more experts *present in court in the morning. I have failed to reach them now."*

As a further indication that the District Judge did not mean to limit the selection of expert witnesses to persons who had heard the appellant's testimony *from his own lips that afternoon,* the District Judge added:

"The reason I made that statement is that we have a good many qualified men in this community."

Once again counsel for the appellant showed that he clearly understood the Court's ruling, for he replied:

"Mr. Morgali: I agree with Your Honor, and *we will bring in* several of the doctors."

Here was a plain invitation to counsel for the appellant—an invitation that counsel accepted—to bring in *any* qualified physician in Las Vegas, regardless of whether such physician happened to be in the courtroom that afternoon. No other rational interpretation of the Court's language is possible.

In any event, the appellant resumed the stand on the following morning, and virtually repeated his testimony of the previous day.

The trial court has considerable latitude in such matters.

In 32 C.J.S., Evidence, § 549, p. 343, the rule is thus stated:

*"Discretion of court.* The general rule that matters pertaining to the examination of witnesses rest largely within the discretion of the trial court, applies in the case of skilled or expert witnesses who testify as to matters of opinion."

In the instant case, before the appellant had testified in any great detail regarding facts pertinent to his mental and emotional life and condition, his counsel informed the Court that they would call experts who had never interviewed the appellant, and they would be asked to express opinions as to his sanity, in response to hypothetical questions embodying the facts as given in evidence. Thereupon the Court gave the ruling already quoted and discussed.

It will be recalled that the proposed hypothetical question would have taken about fifteen minutes to propound. Regarding a hypothetical question of that type, in 2 Wigmore on Evidence, 3d ed., § 685, page 812, we find the following comment:

*"Length of Hypothetical Question.* On principle, the questioner is entitled (as already noted) to obtain an opinion upon any combination of facts, however few or however numerous. Hence, the mere *length* of a question of itself is no objection. But, for the same reasons of policy as before, the Court may exclude a question which by its length tends to confuse or mislead the jury without being of appreciable service. This discretion of the trial judge ought to be absolute, and should have been exercised much more frequently than it is in excluding tedious and useless questions."

In 3 Jones' Commentaries on Evidence, 2d ed., volume 3, § 1339, pages 2448–2449, we find the following pertinent observation:

"Moreover, since the facts sought to be presented in a hypothetical question may be very numerous, it

sometimes happens that objection is made to the length of the question. But this is a matter to be regulated largely by the discretion of the trial judge. There are instances, however, in which it has been held error to permit hypothetical questions so long and complicated that they were likely to confuse witnesses or to baffle their memory."

Elsewhere in his monumental work, op. cit., § 1328, page 2430, Professor Jones observes that "generally speaking the trial court is the arbiter of the propriety of the question".

And upon the general desirability of the hypothetical question as a forensic tool, Professor Wigmore, op. cit., § 686, page 812, spews characteristic vitriol, only a few drams of which we need atomize here:

"*Abolition of the Question as a Requirement.* What is to to be the future of the hypothetical question? *Must the Hypothetical Question go, as a requirement?*

"Its abuses have become so obstructive and nauseous that no remedy short of extirpation will suffice. It is a logical necessity, but a practical incubus; and logic must here be sacrificed. After all, Law (in Mr. Justices Holmes' phrase) is much more than Logic. It is a strange irony that the hypothetical question, which is one of the few truly scientific features of the rules of Evidence, should have become that feature which does most to disgust men of science with the law of Evidence.

"The hypothetical question, misused by the clumsy and abused by the clever, has in practice led to intolerable obstruction of truth."

Be that as it may, we hold that in the instant case the court below did not abuse its discretion by requiring that the appellant's expert witnesses hear all of the appellant's testimony on the issue of his sanity, either from his own lips or by having it read back to them. The expert that was put on the stand by the appellant actually heard all of the latter's testimony that was given on the day following the Court's ruling.

We are not surprised that the jury was apparently not impressed by the testimony of the appellant's expert, Dr. James Harrison Swartzfager. Following are the doctor's varying diagnoses of the appellant's mental condition as of August, 1955, the month in which the crime was committed:

"Q. Based upon the testimony of the defendant, have you any opinion as to his sanity as of August 1955, sanity or insanity? A. I couldn't say the man is insane, but I could say he is emotionally unstable."

"I would say he didn't know right from wrong."

"I would say the man was mentally sick; mentally ill."

"Q. Is mentally ill the same as being insane, Doctor? A. Yes."

Since the standard and generally accepted definition of legal insanity is the inability to distinguish between right and wrong, *infra*, Dr. Swartzfager in one breath was telling the jury that he couldn't say that the appellant was insane, and in the next breath that the appellant *was* insane—both because the appellant could not distinguish between right and wrong, and because he was "mentally ill". "Mentally ill", according to the doctor, is the same as "insane".

### 5. *The District Court's Instruction on Insanity Was Proper.*

The appellant's third and fourth specified errors relate to the trial court's instruction on insanity and the Judge's refusal to give the appellant's requested instruction.

The requested instruction was as follows:

"If you the jury believe beyond a reasonable doubt that the accused was not suffering from a diseased or defective mental condition at the time he committed the criminal act charged, you may find him guilty.

If you believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental abnormality, you may find him guilty.

"Unless you believe beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity. Thus your task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect. He would still be responsible for his unlawful act if there was no causal connection between such mental abnormality and the act. These questions must be determined by you from the facts which you find to be fairly deducible from the testimony and the evidence in this case."

Instead, the Court gave the following instruction, to which the appellant objects:

"In order for insanity to be a legal defense to the commission of a crime there must be:

"(a) Such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong; or

"(b) He must be unconscious and unaware of the nature of the act at the time he is committing it; or

"(c) Where, though conscious of it and able to distinguish between right and wrong and know that the act is wrong, yet his will, or the governing power of his mind, has been otherwise than voluntarily, so completely destroyed that his actions are not subject to it, but are beyond his control."

The instruction that the appellant requested is the one that was given by the Court of Appeals for the District of Columbia, in Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862, 869–876, 45 A.L.R.2d 1430, instead of the generally accepted formula announced in the celebrated M'Naghten's Case, 10 Clark & Finnelly 200, 210, Eng.Rep. 718 (1843).

The appellant admits that "the Durham case constitutes a radical departure from the rules theretofore adhered to in all English-speaking jurisdictions with the exception of New Hampshire".

This Court has no desire to join the courts of New Hampshire and the District of Columbia in their "magnificent isolation" of rebellion against M'Naghten, even though New Hampshire has been traveling down that lonesome road since 1870. See State v. Pike, 49 N.H. 399. Rather than stumble along with Pike, we prefer to trudge along the now well-traveled pike blazed more than a century ago by M'Naghten.

We are fortified in this choice by the thought that the Supreme Court also has steadfastly journeyed with M'Naghten. In the leading case of Davis v. United States, 1897, 165 U.S. 373, 378, 17 S.Ct. 360, 362, 41 L.Ed. 750, the Court approved the following instruction:

" 'The term "insanity," as used in this defense, means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing, or where, though conscious of it, and able to distinguish between right and wrong, and know that the act is wrong, yet his will—by which I mean the governing power of his mind— has been otherwise than voluntarily so completely destroyed that his actions are not subject to it, but are beyond his control.' "

The M'Naghten case has been approved by the Supreme Court up to the present day. In Fisher v. United States, 1946,

328 U.S. 463, 466, 66 S.Ct. 1318, 1320, 90 L.Ed. 1382, the Court said:

> "It is the contention of the defense that the mental and emotional qualities of the petitioner were of such a level at the time of the crime that he was incapable of deliberation and premeditation *although he was then sane in the usual legal sense.  He knew right from wrong.*  See M'Naghten's Case * * *."  [Emphasis supplied.]

And in Leland v. State of Oregon, 1952, 343 U.S. 790, 800, 801, 72 S.Ct. 1002, 1008, 96 L.Ed. 1302, the Court used the following language:

> "Knowledge of right and wrong is the *exclusive* test of criminal responsibility *in a majority of American jurisdictions.*  The science of psychiatry has made tremendous strides since that test was laid down in M'Naghten's Case, but the progress of science has not reached a point where its learning would compel us to require the states to eliminate the right and wrong test from their criminal law.  Moreover, choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility."  [Emphasis supplied.] [2]

Accordingly, we find no error in the Court's instructions on the subject of insanity.

### 6. *Conclusion*

It is the considered judgment of this Court that the denial of the appellants' motion to suppress evidence and the subsequent admission of the photographic exhibits were proper; that the District Judge exercised sound discretion in ruling upon the manner in which expert testimony relating to sanity should be presented; and that the Court's instruction on insanity, and its refusal to give the instruction on that subject sought by the appellant, were both proper.

Accordingly, the judgment is

Affirmed.

JAMES ALGER FEE, Circuit Judge (concurring).

I concur in the result reached in this opinion.

The search was not illegal, but clearly legal.  There was a lawful search warrant issued by a state official, based upon the theft of a camera apparently already in the possession of the state officers.  The authorization was for the seizure of articles supposed to have been stolen in burglaries.  But under its authority photographic prints, possibly made through the use of the stolen camera, could have been taken by state officers.  Additionally, the prints of money were illegal and contraband under Nevada law[1] and could have been seized as evidence in connection with the alleged theft of a camera.  A second ground is that the entry of the state officers into an office open to the public in order to serve a warrant of arrest was legal.  This warrant of arrest was served and thereby an independent, valid ground of seizure of illegal articles in this office was laid.  No dwelling house is involved.  The fact that the articles lawfully seized were turned over to the federal government is immaterial.

The ground that there was no federal participation in the search, as held in the majority opinion, is likewise sound.

The trial court did not abuse its discretion in regulating the testimony of experts.

The instructions to the jury with regard to insanity were sufficient.

The judgment should be affirmed.

---

2. See also Matheson v. United States, 1913, 227 U.S. 540, 543, 33 S.Ct. 355, 57 L.Ed. 631, and Howard v. United States, 5 Cir., 1956, 232 F.2d 274, 275.

1. Nev.Comp.Laws 1929, § 10364.