**UNITED STATES of America,**
**Appellee,**

v.

**Satiris Galahad FASSOULIS, Appellant.**
**No. 355, Docket 26634.**

United States Court of Appeals
Second Circuit.

Argued May 22, 1961.

Decided July 19, 1961.

William F. Hamilton, New York City, for appellant.

David R. Hyde, Asst. U. S. Atty., Southern District of New York, New York City (Robert M. Morgenthau, U. S. Atty., and George I. Gordon, Asst.

**244**

U. S. Atty., S.D.N.Y., New York City, on the brief), for appellee.

Before CLARK, HINCKS and WATERMAN, Circuit Judges.

HINCKS, Circuit Judge.

After trial from October 3 to October 11, 1960, before Judge Kaufman, a jury having been duly waived, the appellant was found guilty of having devised a scheme to defraud one A. Mitchell Liftig by means of false representations and having caused the transmission of a communication by interstate wire for the purpose of executing the fraudulent scheme. This appeal is from the resulting judgment of conviction.

The facts as he found them were set forth in a lucid statement by Judge Kaufman at the close of the trial.[1] This statement, since not elsewhere published, we will include in full as an appendix to this opinion. Without restatement or repetition, we will assume familiarity with the contents of that statement.

■ The appellant asserts—and rightly so—that to warrant a conviction the government had to prove beyond a reasonable doubt (a) that the defendant devised a scheme to defraud Liftig by means of false representations and (b) caused a communication by interstate wire for the purpose of executing said scheme. His main ground of appeal is that in several aspects such evidence was wanting. Thus he contends that there was no proof of an intent to defraud Liftig—that numerous false representations he had made to Liftig in the course of their business relations were in fact made in the hope of preventing Fox, his friend and creditor, from foreclosing on the Whitehead Company stock which he had pledged with Fox to secure his debt to Fox. The evidence, however, and especially the testimony of Liftig, Moraites and Purcell, fully warranted the inference that Liftig was the intended victim of a scheme to bring about a merger of four corporations in which Liftig had substantial interests with the hollow corporate shell of the Continental Chartering & Shipping Corporation then owned by the appellant and that, contrary to appellant's contentions, the loan by the First National Bank of Akron, Ohio to Continental on the security of $346,000 in American Telephone and Telegraph debentures (which shortly thereafter proved to be spurious) was brought about by the appellant, who had provided the debentures, for the purpose of executing said scheme. It is true that some of the testimony of the appellant's witness Fox tended to absolve the appellant of fraudulent intent. Nevertheless, there was ample testimony to support the underlying facts recited in the trial judge's findings and on these facts the inferences and conclusions reached were reasonable and, indeed, highly convincing. At the trial it was admitted that in the course of his dealings with Liftig the appellant in unsuccessful efforts to achieve the objective of the scheme had made several false representations and the falsity of still others was established by necessary inferences. It was reasonable to find that the loan from the Akron bank was still another such effort.

■ The appellant also attacks the sufficiency of the evidence to prove the making and the interstate character of the telephone call on December 15, 1955 by Heller of the Akron bank to Rommel of the Chemical Corn Exchange Bank at New York instructing him to pay to Continental $350,000 on the receipt of $346,000 face value A. T. & T. debentures. He contends that the evidence on this issue was inadequate in that Heller did not testify in detail as to the mechanics in placing the call and that neither he nor Rommel testified that either was able to identify the voice of the other as it came over the wire. But of course such testimony is not a requisite to the admissibility of the call when the parties at both ends of the line testify to the

---

1. Previously, jurisdiction and venue had been sustained by Judge Metzner in an opinion reported in 185 F.Supp. 138.

call. Perhaps somewhat more substantial is the appellant's objection that there was no evidence of the geographical location of each participant when the call went through from which the interstate character of the wire carrying the communication might be determined. As to this, Heller testified that on the morning of December 15, "there was received by us" through Continental's loan broker Continental's note for $350,000, a certificate of the corporate vote authorizing the loan with a letter dated December 14 addressed to "First National Bank of Akron, Akron, Ohio," and that on December 15, after receipt of these papers covering the loan, he "called the Chemical Bank, Mr. Rommel." Especially in the context of his testimony followed by Rommel's, we think it reasonable to infer that he was in Akron when he had this telephone talk with Rommel at the Chemical Bank in New York. Moreover, there was in evidence both Akron's office copy of a telegram, also dated December 15, confirming the telephone conversation, which was expressly directed to the Chemical Bank, "NWYK," and Chemical's copy of this same telegram as received by Rommel, according to his undisputed testimony, via Chemical's main office at 30 Broad Street. We find no deficiency in the proof of the interstate character of the telephone call: it is corroborated by the written evidence of the telegram copies. The appellant cites McCormick on Evidence, pages 404 and 405. We find nothing in that text in conflict with our conclusions. Indeed, irrespective of the telephone call the proof of the telegram was enough to establish a communication by interstate wire within the purview of 18 U.S.C.A. § 1343. Our conclusion is not vitiated by the fact that in the telegram, and perhaps in the telephone call, Continental was designated as *"Commercial* Chartering and Shipping Corp." The record makes it plain beyond the peradventure of any doubt that this was a clerical slip wholly without effect on any issue. Even the appellant made nothing of the point on trial or on his main brief on appeal.

In his main brief the appellant lists several other claims of error based upon alleged deficiencies of proof as to the incidents of the alleged fraudulent scheme all of which were overruled in the opinion below. He says the proof must show that he intended to deprive Liftig of "money or property." We think that was shown. Liftig had a property interest in the four corporations which the appellant sought to merge wtih Continental and, if the merger had been brought about by misrepresentations attributing fictitious value to the appellant's proposed contribution to the merger, the effect necessarily would have been to deprive Liftig of the full value of his contribution to the merger. All the false representations proved and conceded, including the implied representation that the A. T. & T. bonds were genuine when the appellant provided them as collateral for Continental's loan, were material in that each tended to bring Liftig's corporations into the merger.

We agree with the court below that on the evidence it would have been naive to believe that the appellant did not know throughout that the A. T. & T. bonds he provided as collateral were spurious. We agree with the government, however, that such knowledge was not essential to its case. For beyond doubt, the loan transaction, in which the interstate wires were used, was a step in the scheme to lure Liftig into the merger: it would serve to bring the S. S. Whitehead into Continental and thus satisfy a condition upon which Liftig would bring his corporations into Continental. The loan transaction was proved beyond dispute and even if the government failed to prove that the appellant falsely represented the genuineness of the bonds, as charged in paragraph 4 of the indictment, it was enough to support a conviction if the government proved a scheme to defraud by one or more of the false representations charged in paragraph 3.

The appellant also claims fatal variances between the indictment and the proof in various trifling matters. We find no merit whatever in these claims.

■ Lastly, the appellant predicates error on the denial by Judge Dimock of his pre-trial motion to dismiss as a violation of his right to a speedy trial as guaranteed by the Sixth Amendment and Rule 48(b) of Fed.Rules Crim.Proc., 18 U.S.C. This point is based upon the fact that although the appellant had been arrested on December 28, 1955 on a complaint charging a violation of 18 U.S.C. § 1343, he was not indicted until October 1959. Then, on October 30, 1959, having at his own request obtained an adjournment until November 4, he moved to dismiss the indictment on the ground that he had been denied a speedy trial in violation of the Sixth Amendment. This motion was denied by Judge Dimock in an opinion reported in 179 F.Supp. 645. As to this point we affirm on Judge Dimock's opinion below.

Affirmed.

## APPENDIX

"The Court: At the outset, I want to commend counsel for both sides for their able presentation of this case and for their courteous demeanor during the course of this case.

"Since this case was tried before me without a jury, it is my function to determine the facts and to adjudicate the ultimate question of guilt or innocence based on the law as I interpret it.

"Previously, on the defendant's motion for a judgment of acquittal made at the close of the prosecution's case, I held in effect that there was sufficient evidence in the record upon which a finding of guilt could be based.

"Now, at the conclusion of the entire case, after carefully considering all the evidence, I find that the government has established beyond a reasonable doubt that the defendant violated 18 U.S.C., Section 1343, proscribing the use of the wires to defraud. Thus, I find the defendant guilty as charged.

"In order to establish its case, the government was required to prove:

"1. That the defendant had devised a scheme to defraud by means of false representations; and

"2. That he caused to be transmitted an interstate telephone call for the purpose of facilitating that scheme.

"I hold that the government has succeeded in establishing both of these essential elements beyond a reasonable doubt.

"Now, the scheme to defraud: That government called several witnesses in order to establish the scheme. The alleged victim, A. Mitchell Liftig, testified that in the fall of 1955 the defendant sought to induce him to merge four companies in which he had substantiated interests in a then hollow corporation owned by the defendant. This corporation ultimately was known as the Continental Chartering & Shipping Corporation, and I shall refer to it hereafter as Continental.

"It appears from the evidence that the defendant was in desperate financial straits at that time. This was made clear by the testimony of the witness Matthew Fox, who testified in behalf of the defendant. The defendant owed Fox between $600,000 and $700,000, and he was being pressed for repayment. If defendant were to succeed in obtaining adequate financing for his new corporation, it was urgent that the corporate assets which Liftig controlled be merged into Continental, and also the defendant was interested in obtaining for Continental the income from Liftig's companies.

"The defendant, relying on the testimony of Fox, argues that his purpose was to stall Fox and to prevent Fox from selling the Whitehead Corporation before the defendant could obtain the funds to reacquire it. But the many representations were made primarily to Liftig and only indirectly and intermittently to Fox. Fox's testimony does not indicate that the representations, for example, as to Michaelson of Alcoa, and the representative of Arthur Andersen & Company who was representing National Bulk Carriers, all of the representations concerning the representation by Attorneys Burke and Nelson, were even communicated to him at all. Further, since Fox and Fassoulis were and had been very good friends, there is no reason given why the defend-

ant needed Liftig as an emissary to Fox. If he wanted Fox to delay, he could have made the same representations to Fox without any intercession by Liftig.

"After observing the witness Fox, I consider his testimony in many respects unsatisfactory. His relationship with the defendant, even in business deals, was on an informal, friendly basis. Their business arrangements, it appears, were quite loose; despite the fact that Fox had made loans to Fassoulis of very large sums of money, Fox testified that he was not certain of the percentage interest paid or if he actually received any interest from Fassoulis. And if my recollection serves me, he testified further that he had never fixed any actual dates for the payment of interest; furthermore, that many of the loans were made without the defendant placing any collateral for such loans. Fox testified, indeed, that the defendant at the present time owes him approximately $300,000. I believe there, too, that this debt is not collateralized. Moreover, Fox frankly admitted, when pressed, of course, that he had discussed the pending case several times with the defendant personally prior to his testifying.

"In the course of the few months after the meeting between Liftig and Fassoulis, the defendant made every effort toward convincing Liftig of the wisdom of a merger of Liftig's four corporations into Continental, representing that the transaction would be financially advantageous to Liftig and his associates and would make Continental an excellent subject for future income and financing. In exchange for the merger, Liftig and his associates were to receive 40 per cent of the stock in the new corporation. The defendant made a large number of false and fraudulent representations, both orally and documentary, all intended to induce Liftig to merge his companies. In this connection, the defendant it appears accurately represented to Liftig that he formerly owned the Whitehead Steamship Company which controlled a valuable Liberty ship, the SS Whitehead, and that he had pledged the stock of this corporation with Fox to secure a portion of a loan. Further, that

he could reacquire the stock for Continental by repaying this debt to Fox and that he would arrange to do so. However, after these initial representations, there followed a series of fabrications intended by the defendant to create the image of an individual with sound business contact and financial substance, and so he misrepresented to Liftig that he was in the process of acquiring, and later that he did actually acquire, two charters from Alcoa, one of which was going to produce an income of $14,000 per month, while the other was to produce 12 to $12,500 per month. During one conference with Liftig, the defendant exhibited documents which he represented to be these charters.

"Peter Moraites, an attorney retained by Continental, and also a government witness, corroborated the existence of these documents and their exhibition by the defendant. Liftig, Moraites and others testified to the defendant's later admission that no such charters existed and that the documents had been the figments of his imagination, prepared solely by him.

"Further, Liftig testified that the defendant represented that he had acquired the Amerex Corporation, which he stated owned a valuable ship, the SS Amerosia. According to these same witnesses, this too the defendant later admitted was untrue and that there was no Amerex Corporation, nor an SS Amerosia, and this appears to be not contested here. Prior to these admissions, however, the misrepresentations were presented frequently by the defendant in different contexts.

"Once it appeared that the defendant had succeeded in interesting Liftig, it was vital that the defendant keep this interest in the financial venture unabated until Liftig's four corporations were acquired. To further bait the hook, in the course of negotiations with the underwriters Gearhart & Otis, who had been consulted by the witness Purcell, also an attorney for Continental, the defendant again misrepresented that he owned the two charters and the Amerex Corporation. In addition, Purcell, if my recollection serves me, testified that the defendant

had represented that he was negotiating for the acquisition of a third ship, and all of these representations were untrue. These negotiations with Gearhart & Otis were never pursued further by the defendant and were permitted to lapse.

"It is to be noted that in connection with the Alcoa charters another device was used by the defendant in an effort to keep Liftig interested, and that was the statement to Liftig that he would arrange for Liftig to meet a man whom he referred to as a Mr. Michaelson, supposedly a representative of Alcoa. Several purported meetings were arranged, but while Liftig appeared, the so-called Michaelson never did appear. Each time the defendant gave spurious reasons for his failure to appear, and subsequently, as several witnesses testified, the defendant admitted that Mr. Michaelson did not exist. And there is a stipulation on the record between counsel that if a representative of Alcoa were called to testify, he would testify that no man by the name of Michaelson was or is employed by Alcoa, and that certain alleged charters which were supposedly entered into in behalf of Alcoa were not true documents.

"Further fraudulent conduct on the part of the defendant, intended to induce Liftig to string along, appears throughout this case. In this category falls the creation of an elaborate contract, Exhibit 10, which purported to involve the National Bulk Carriers, a prominent shipping company, and which contract the defendant represented would benefit Continental substantially. The defendant's machinations are further illustrated by another purported meeting between Liftig and the alleged representation of National Bulk Carriers. The defendant had told Liftig that a representative of Arthur Andersen & Company, accountants for National Bulk Carriers, would appear to represent National Bulk Carriers. At the alleged meeting place, no such representation appeared, and this alleged transaction was ultimately abandoned. Subsequently, according to the testimony, the defendant admitted that there was no such transaction, and that this too had been concocted by him.

"Nevertheless, all these representations had accomplished their purpose. Liftig was growing more eager and becoming more impressed with the ability of the defendant who would be his future associate and who was giving the appearance of one able to produce lucrative business contracts.

"In early December of 1955 the defendant was still looking toward the merger with Liftig's four sound companies so as to acquire a substantial basis for obtaining future financing for Continental and to obtain the income from these companies. Liftig, induced by the defendant's many false representations, was still interested in the transaction, but would proceed only if Continental had the substance which the defendant represented, among them being the assurance of income of at least $10,000 per month from the Alcoa charter. Liftig's participation up to this time and his frequent meetings with the defendant and his selection as president of Continental and his signing of checks as president of Continental can be accounted for on no other basis except that the defendant was building up Liftig to the point where he would be ripe for the merger of the companies in which he had his interest.

"At this juncture the opportunity for which the defendant had been waiting apparently presented itself. As his first step, he had to get the SS Whitehead released by Fox and the corporate stock transferred to him. So he devised the plan to tell Liftig of a man named Eichler who wished to enter into a contract with Continental on behalf of a wealthy shipping magnate named Vergottis. The defendant later admitted that Eichler did not represent Vergottis, that in fact Eichler never existed. Pursuant to this new facet of the scheme, the defendant fraudulently drafted an elaborate contract, Government's Exhibit 11, and represented that it was a contract between Continental and Eichler. As the defendant later admitted, this contract too was just another creature of his imagination. When

Liftig wished to meet Eichler, the defendant arranged several meetings, but each time invented a reason why Eichler could not appear. To create an air of authenticity and, to use the language of the brief submitted by the defendant, 'to make Liftig's tongue hang out,' the defendant further falsely represented that Eichler was being represented by Mr. O. Taft Nelson and later by Mr. Morgan Burke, both prominent attorneys, and both testifying that they had never represented a Mr. Eichler or ever heard of Mr. Eichler.

"In connection with the device involving the fictitious Eichler, the defendant represented to Liftig that Eichler was to put up $800,000 of AT&T debentures which would be used to collateralize a bank loan which in turn would be used to pay Fox a portion of his loan and thus obtain the Whitehead stock. Overnight this amount was changed by the defendant to $346,000 in AT&T debentures. The transaction went through as planned, the money was borrowed, the debentures posted as collateral, and it appears that the defendant was within arm's length of reacquiring the Whitehead stock. When viewed in context, this was but another step by which the defendant hoped to induce Liftig to act on the merger, and it is clear that the plan still retained its fraudulent character. For even if the debentures had been genuine, which they were not, the defendant, in order to obtain the financing and the income he desired, still required the merger of Mr. Liftig's four sound companies into Continental. Mr. Liftig's testimony is clear that in addition to the control of the SS Whitehead by Continental, a charter producing at least $10,000 a month income to Continental was a condition precedent to such a merger and that he was relying on defendant's false representation that such a charter was already in existence on a firm commitment basis.

"I should note before I leave this element of the case that the defendant, in his brief submitted to me upon the conclusion of the case, has conceded on page 4, and I quote:

" 'And so defendant concedes that the alleged Alcoa contracts were phony; that the acquisition of the non-existent stock of Amerex and its asset the Amerosia was a myth; that the contract with National Bulk Carriers was fabricated; and that the alleged deal as presented with one Eichler was a hoax.'

"Inherent in such a concession is the fact that the defendant must also agree, therefore, that the representations with respect to Burke and Nelson were fraudulent; that the alleged meetings that he was setting up with Mr. Michaelson, with Mr. Eichler, with the representative of the National Bulk Carriers were also frauds.

"Now I come to the telephone call. The testimony of witnesses Rommel and Heller establishes that on the morning of December 15, 1955, a telephone call was placed by the First National Bank of Akron to the Chemical Corn Exchange Bank in New York. The purpose of the call was to make arrangements by which the loan to Continental could be obtained at the New York bank. Thus it is clear that the telephone call was necessary for the defendant's plan to be realized since without it the loan could not have been obtained and the scheme would have failed. Thus, the requirement that the interstate call be incident to the scheme to defraud (see Pereira v. United States, 1954, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435), was met.

"It is equally clear that the defendant caused the call within the meaning of the statute. It is sufficient that the defendant knew or could reasonably have foreseen that an interstate call would be made (Pereira v. United States, supra).

"The witness Moraites testified that the defendant knew on December 14th, the day before the call was made, that the money was to come from Akron with delivery to be made in New York where the bonds were to be posted as collateral. Mr. Rommel testified that it is the ordinary custom of the banking profession in this situation for a telephone call between the banks to precede the delivery of the

money. Furthermore, the defendant expected and wanted the money as soon as possible and did obtain it immediately after being advised that it was available at the Chemical Bank of New York. He certainly expected the banks to use the most expeditious means for completing the necessary arrangements. Thus the evidence shows that the defendant had every reason to foresee that a call would be made before the money could be obtained.

"Thus, I hold that the two elements of the offense charged, to wit, a scheme to defraud Liftig through false representations and a telephone call caused by the defendant for the purpose of facilitating that scheme, have been established beyond a reasonable doubt, and, as I have said before, I find the defendant guilty accordingly.

"Furthermore, though such a finding is not essential to my holding that the government has established the guilt of the defendant beyond a reasonable doubt, I believe without summarizing the evidence, which is complete and full in the record, that the circumstantial evidence establishes beyond a reasonable doubt that the defendant knew when he first produced the debentures and throughout the transaction that they were in fact counterfeit.

"The defendant argues in his behalf that if only a scheme to defraud Liftig is established and not a scheme to defraud the two banks as well, there is a variance which is fatal to the prosecution. He also argues that since the indictment includes a scheme to defraud Liftig of his assets and the evidence indicates that the assets, if any, which the defendant desired were owned by four companies in which Liftig had only a substantial minority interest, a fatal variance has been shown. But the law is clear that a variance is fatal only if it in some way impairs the defendant's substantial rights (see Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; United States v. Sing Kee, 2 Cir., 250 F.2d 236, certiorari denied 355 U.S. 954, 78 S.Ct. 538, 2 L.Ed.2d 530; United States v. Schwartz, 150 F.2d 627, certiorari denied 326 U.S. 757, 66 S.Ct. 97, 90 L.Ed. 454), and the defendant has in no way shown or attempted to show that he has been prejudiced or misled in his preparation for trial. The defendant also argues that, while there may have been fraud at the outset, the fraudulent scheme had ceased before the call was made and the loan obtained. This contention has been fully dealt with in the discussion above, and I have already held that one continuous scheme has been proven.

"The defendant contends that since no one was actually defrauded and since the banks were eventually repaid, there is no basis to find a violation of the statute. But the law is clear that it is not essential that the scheme result in success to the defendant or loss to the intended victim in order for a conviction to stand up (see United States v. Feldman, 2 Cir., 136 F.2d 394, affirmed 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408, rehearing denied 323 U.S. 811, 65 S.Ct. 26, 89 L.Ed. 646; Hoffman v. United States, 9 Cir., 249 F.2d 338, 341).

"I should say in passing that I believe the inferences to be drawn from the defendant's conduct following the appearance of the article in the New York Times which appeared on December 21, 1955, and which is an exhibit in evidence, and which article revealed the circulation of the counterfeit bonds, and I refer particularly to his activity concerning the alleged repayment to the bank and the bank's attorney and Blair & Company, so eloquently pleaded here this morning by Mr. Siegel, and his activities in connection with the investigation into the authenticity of the bonds, are adverse to the defendant, for I believe they were motivated by a desire to allay suspicion and wrap him in an aura of innocence. It is inconsistent for him to take the position that he believed at all times that the bonds were legitimate in the light of the highly suspicious circumstances concerning his acquisition of the bonds. Furthermore, it is inconsistent for him to take the position that he cannot reveal the

source of these bonds for fear of bodily harm, when indeed he did not have any fear in dealing with these people in the first instance.

"So the judgment of this Court is that the defendant is guilty."