### UNITED STATES of America
### v.
### Satiris Galahad FASSOULIS. Defendant.

United States District Court
S. D. New York.
March 13, 1962.

Robert M. Morgenthau, U. S. Atty., New York City, David R. Hyde, Asst. U. S. Atty., New York City, of counsel, for United States of America.

Maurice Edelbaum, New York City, for defendant.

WEINFELD, District Judge.

The defendant moves, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, 18 U.S.C., for an order granting him a new trial on the ground of newly discovered evidence and in the interest of justice. He was convicted on October 11, 1960 after a five-day trial before then District Court Judge Irving R. Kaufman, without a jury, of having devised a scheme to defraud one A. Mitchell Liftig by means of false representations and having caused the transmission of interstate wire communications to execute the fraudulent scheme.[1] He was sentenced to two years in prison. The judgment of conviction was upheld on appeal on July 19, 1961,[2] and the Supreme Court denied certiorari on November 20, 1961.[3] Thereafter, on December 18, 1961, the day set for the defendant to surrender, he made this motion.

In affirming the conviction, the Court of Appeals incorporated in its opinion the findings of Judge Kaufman made at the conclusion of the trial, and familiarity with the facts recited therein, and with the trial testimony, is assumed. This Court, since it did not have the advantage of knowledge derived from the conduct of the trial,[4] has also read the appendix submitted by the defendant on his appeal to the Court of Appeals, a copy of which was made part of this motion.

The essence of the scheme devised by the defendant was to defraud Liftig of his substantial stock interest in four companies through their merger with the Continental Chartering and Shipping Corporation, a hollow corporate shell controlled by Fassoulis, the defendant. The merger scheme contemplated the acquisition by Continental of the stock of Liftig's four corporations; it also re-

1. 18 U.S.C. § 1343.

2. United States v. Fassoulis, 293 F.2d 243 (2d Cir. 1961).

3. 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961).

4. Compare United States v. Johnson, 327 U.S. 106, 112, 66 S.Ct. 464, 90 L.Ed. 562 (1946); United States v. On Lee, 201 F.2d 722, 723 (2d Cir.), cert. denied, 345 U.S. 936, 73 S.Ct. 798, 97 L. Ed. 1364 (1953).

quired that the defendant turn over to Continental, free and clear, all the shares of stock of the Whitehead Steamship Corporation, which owned a valuable vessel, the s/s Whitehead. This stock had been pledged with one Matthew Fox and others by the defendant to secure the repayment of substantial amounts due them. Thus an essential step in the scheme was the reacquisition of the Whitehead stock, since without it Liftig would not consent to the merger of his four companies with Continental.

At the time of his negotiations with Liftig, the defendant was hard pressed financially and the pledgees of the Whitehead stock were pressing for payment and threatening to sell the stock. The Trial Court found that the defendant, to create a false picture that he was a man of wealth and with substantial business contracts, made "a large number of false and fraudulent representations, both orally and documentary," all intended to further the scheme to defraud and to induce Liftig to merge his four companies with Continental. It had its culmination when the defendant produced $346,000 in American Telephone and Telegraph debentures, which were deposited with the Chemical Corn Exchange Bank of New York as collateral for a loan to Continental of $350,000 from the First National Bank of Akron, Ohio. It was in connection with this transaction that the interstate communication was made from Akron, Ohio, to New York. The purpose of the loan was to use the proceeds to repay Fox and others so that Continental would acquire the Whitehead stock. The debentures given to secure the loan turned out to be counterfeit.

The evidence upon which the Trial Court's findings were based came from Liftig, attorneys and other witnesses and was buttressed by documents, defendant's admissions—both oral and written —and stipulations upon the trial. The Court in substance found that the defendant, in furtherance of the fraudulent scheme, made the following material representations to Liftig, all of which were false:

(1) That as a result of his negotiations, he had acquired and there were in existence two valid bareboat charters with Alcoa Steamship Company, Inc. on the s/s Whitehead and the s/s Amerosia, which would yield a combined monthly income of between $26,000 to $26,500.

(2) That documents which the defendant exhibited to Liftig were the above referred to charters.

(3) That defendant was in contact, and negotiated, with a Mr. Michaelson, a representative of Alcoa, relative to the aforementioned charters.

(4) That the defendant, or Continental, acquired the stock of Amerex Shipping Corporation which he stated owned the s/s Amerosia.

(5) That he was negotiating for a third ship.

(6) That a contract was being negotiated between National Bulk Carriers, a prominent shipping concern, and Continental relating to the sale of a vessel and two charters.

(7) That one James Eichler, acting on behalf of Vergottis, a wealthy shipping magnate, negotiated a contract with the defendant involving a cash payment of $800,000 to Continental; that thereafter a valid contract was entered into and was in existence between Continental and Eichler, which the defendant delivered, under the terms of which, in general, Eichler was to acquire the Amerex stock, the two Alcoa charters and the stock of Whitehead Steamship Corporation, which then was to be turned back to Continental, and Eichler was to bareboat charter the s/s Whitehead from Continental for forty months at $10,000 per month; that in connection with the foregoing agreement, Eichler was represented originally by O. Taft Nelson, Esq. and later by Morgan Burke, Esq., attorneys.

Later, the defendant represented that because Eichler was short of cash he would put up $800,000 face value American Telephone and Telegraph debentures with authorization to Continental that they could be deposited as collateral for a loan. The defendant exhibited an es-

crow letter purportedly signed by Morgan Burke, Esq. to the effect that Burke was holding 800 A T & T bonds pending delivery of the charter assignments and the Amerex stock. Later, the defendant represented that instead of the larger amount of debentures as had been agreed upon, he had received from Eichler only $346,000 in debentures. These were the securities produced by Fassoulis and used as collateral for the loan made by the Akron bank to Continental.

With respect to this so-called Eichler transaction, the Trial Judge found it was fictitious; that Eichler was nonexistent; that the defendant had drafted the Continental-Eichler contract; that attorneys Nelson and Burke neither represented nor ever heard of Eichler—in sum, that the purported transaction was "just another creature of his imagination."

Reference to the defendant's various misrepresentations as found by the Court is made since they bear on the claim of newly discovered evidence upon which the defendant predicates his motion.

■■■ The orderly administration of justice requires finality of judgment rendered after a trial unless injustice results. The findings of the trier of the fact, whether court or jury, should not be disturbed on motions for a new trial based upon alleged newly discovered evidence except for most extraordinary circumstances.[5] The criteria which govern favorable consideration of such applica-

tions are well defined.[6] The Court must be satisfied that the evidence (1) is in fact newly discovered, i. e., discovered since the trial; (2) could not with due diligence have been discovered earlier; (3) is not merely cumulative or impeaching; (4) is material to the issues, and finally, (5) is such, and of such nature, that upon a retrial it will probably produce an acquittal.[7] The burden of satisfying these requirements is upon the defendant. So tested, his motion must fail.

Analysis of the evidence now offered through affidavits of four witnesses demonstrates that the defendant has failed in all essentials to meet his burden—the fact is that the proposed evidence is not newly discovered; that it was known to the defendant prior to and at the time of trial; that three witnesses were not only available, but present at the trial and, as to the fourth, diligent effort would have produced him; that it is both cumulative and impeaching, and finally, and above all, even assuming materiality to the issues, there is little likelihood that a retrial would result in an acquittal.

The proposed witnesses include the defendant himself, John G. Broady, a convicted and disbarred attorney, Basil Estreich, a practicing attorney, and Joseph Pata, Jr., a former employee of the defendant.

The thrust of the affidavits of three of the four witnesses centers principally about alleged Eichler transactions. The defendant, Broady and Pata, Jr. offer to

5. United States v. Johnson, 327 U.S. 106, 111, 66 S.Ct. 464, 90 L.Ed. 562 (1946); United States v. Costello, 255 F.2d 876, 879 (2d Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958); Weiss v. United States, 122 F.2d 675, 691 (5th Cir.), cert. denied, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941).

6. In this instance the Court is applying the so-called Berry test, Berry v. State, 10 Ga. 511, 527 (1851), and not the Larrison test, Larrison v. United States, 24 F.2d 82, 87–88 (7th Cir. 1928), applicable in instances of recantation of testimony. Cf. United States v. Costello, 255 F.2d 876, 879 (2d Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551

(1958). See also, United States v. Johnson, 327 U.S. 106, 110 n. 4, 111 n. 5, 66 S.Ct. 464, 90 L.Ed. 562 (1946).

7. United States v. Costello, 255 F.2d 876, 879 (2d Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958); United States v. On Lee, 201 F.2d 722, 723 n. 3 (2d Cir.), cert. denied, 345 U.S. 936, 66 S.Ct. 464, 90 L.Ed. 562 (1953); United States v. Hiss, 107 F. Supp. 128, 136 (S.D.N.Y.1952), aff'd on opinion below, 201 F.2d 372 (2d Cir.), cert. denied, 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368 (1953). See Mills v. United States, 281 F.2d 736, 738 (4th Cir. 1960).

testify upon a retrial that in fact the defendant did have dealings with one Eichler; that Eichler represented to the defendant that he, Eichler, had obtained to bareboat charters from Alcoa; that he had purchased the Amerex Corporation; that Amerex owned the s/s Amerosia; that he tried to make a deal with National Bulk Carriers; that Eichler proposed a deal on behalf of Vergottis, originally involving $800,000 face value A T & T debentures, against which securities Continental would be permitted to borrow; that later, at a luncheonette at 19 Rector Street, New York City, Eichler delivered part of the securities to the defendant; that Eichler then requested $20,000 cash deposit from the defendant as evidence of good faith since he was parting with the securities. It will be observed, with the exception of the delivery of the securities and the request for a $20,000 cash deposit, that the representations attributed to Eichler are some of the very misrepresentations which the Trial Judge found the defendant had made in furtherance of his scheme to defraud Liftig.

First, as to the defendant. He proposes to testify that he relied upon Eichler's good faith in connection with the statements made by the latter relative to the Amerex Corporation, the s/s Amerosia, the Alcoa charters and the A T & T debentures; that Eichler gave him the bareboat charters; that he did not know the debentures received were counterfeit. In sum, that he was an innocent victim who had been duped by Eichler and that he merely related to Liftig the various representations made by Eichler; that the defendant in making the statements to Liftig was unaware of their falsity.

Further, he proposes to testify that he was not interested in acquiring Liftig's four companies and refused them in the presence of Matthew Fox and Basil Estreich. Fox, as will hereafter appear, testified as to this matter and hence the evidence is not only cumulative, but also of an impeaching nature since the Government's proof was to the contrary.

The defendant did not testify in his own defense. He heard witness after witness, including an attorney who represented his company, Continental, testify that when the authenticity of the securities was first questioned, the defendant stated he had obtained them from Eichler, "a man he had met on the dock"; that, later, when it was definitely known the securities were counterfeit, he admitted there were "no Alcoa charters"; "no Amerex"; "no Amerosia"; "no Michaelson"; "no Eichler"; but refused to identify the source of the bonds, saying he feared for the safety of his family. The defendant also heard Government witnesses swear that he not only admitted preparing the Eichler contract, but signing all the names thereon, including Eichler's; that likewise in the instance of the Alcoa charters he had drawn them and had signed all the names appearing thereon. The force of the testimony was so compelling that defendant's lawyer in summation acknowledged the deal with Eichler "was a hoax." When questioned by an FBI agent, defendant persisted in refusing to disclose the source of the bonds other than to say that an unidentified man with a criminal record, then out on parole, had steered the suppliers of the bonds to him and that he, the defendant, had put up $20,000 in cash as an indication of good faith under an agreement with the suppliers whereby they were to get 10% of the profits realized by Continental in any deal in which the bonds were used.

In the face of this avalanche of incriminating testimony the defendant, as was his right, decided not to take the witness stand. His explanation is that he relied upon the advice of his counsel. He had the services of an able trial lawyer with long experience in the trial of criminal cases. The decision that he not testify was deliberately made; the defendant acquiesced therein. There is no claim by the defendant, and indeed if made it would fly in the face of this record to so contend, that he was not com-

petently represented.[8] He had the opportunity to give his version of events, to assert his good faith in making the representations and the lack of intent to defraud, but declined to expose himself to cross-examination. A defendant may not engage in a strategem or trial tactic and when it fails have a retrial.[9] Certainly by no stretch of the imagination can his proffered testimony now be called newly discovered; moreover, clearly it is corroborative in part of the testimony of Matthew Fox, the sole witness called by the defendant.

In addition, while the defendant stresses his present claim that when he received the A T & T securities from Eichler he was unaware they were counterfeit, the fact is that guilty knowledge was not essential to the finding of guilt. He was charged with making a series of false representations as part of his scheme to defraud, proof of any one of which would satisfy that element of the crime. The Court of Appeals specifically agreed with the Trial Judge that although the evidence fully supported his finding that the defendant knew the bonds were spurious, such a finding was not essential to the Government's case, since proof of other false representations was sufficient to support the conviction.[10]

The second proposed witness is John G. Broady, who confirms what the defendant states with respect to various meetings with "one James Eichler" and the latter's alleged representations, which in turn the defendant now claims he innocently passed on to Liftig.

At the time of trial Broady was serving a sentence of two to four years at Auburn State Prison, New York, following his conviction in a state court for illegal wiretapping, and he then was under indictment in this Court for income tax evasion. The excuse offered for the failure to call Broady as a defense witness is Broady's reluctance to testify for fear he would incur the animosity of the Federal authorities and thus jeopardize his pending income tax evasion case. Apparently he has no such concern now, although the tax charges are still pending. In any event, apart from the fact that this evidence is not newly discovered, the short answer is that during the trial Broady was brought from Auburn State Prison to this Court under a writ ad testificandum. He was interviewed by the defendant's trial counsel, who requested and was granted an afternoon's adjournment of the trial for that express purpose.[11] Following the interview it was decided not to call Broady as a witness. The conclusion is warranted that either he had no contribution to make to the defendant's case, or that the defendant was not prepared to vouch for his credibility. Whatever the reason, Broady was available as a witness by force of the Court's process and, notwithstanding his professed reluctance, his testimony could have been compelled, subject, of course, to his constitutional right against self-incrimination. Had he been called to the witness stand, the only restraint upon him would have been his oath to testify truthfully.

8. The defense was conducted with such vigor and ability that the Trial Judge not only commended counsel, but suggested that the younger members of the Bar might well profit by the example of advocacy. Appendix, Defendant's Brief on Appeal 272a, United States v. Fassoulis, 293 F.2d 243 (2d Cir. 1961).

9. United States v. Sumpter, 111 F.Supp. 507, 511 (S.D.N.Y.1953), aff'd, 228 F. 2d 290 (1955). See United States v. Bertone, 249 F.2d 156, 160 (3d Cir. 1957). Cf. United States ex rel. Reid v. Richmond, 295 F.2d 83, 89–90 (2d Cir. 1961); United States ex rel. Darcy v.

Handy, 203 F.2d 407, 426 (3d Cir.), cert. denied, Maroney v. United States ex rel. Darcy, 346 U.S. 865, 74 S.Ct. 103, 98 L.Ed. 375 (1953). See also, Cruzado v. People of Puerto Rico, 210 F.2d 789, 791 (1st Cir.1954); United States v. Sorrentino, 175 F.2d 721, 723 (3d Cir.), cert. denied, 338 U.S. 868, 70 S.Ct. 143, 94 L. Ed. 532 (1949).

10. United States v. Fassoulis, 293 F.2d 243, 245, 250 (2d Cir. 1961).

11. Appendix, Defendant's Brief on Appeal 53a, 275a, United States v. Fassoulis, 293 F.2d 243 (2d Cir. 1961).

The third witness relative to Eichler transactions is Joseph Pata, Jr., who had been employed by one of the defendant's companies, as had been his father, Joseph Pata, Sr. His affidavit sets forth that he was present, together with his father and Broady, when Eichler delivered to the defendant in a luncheonette at 19 Rector Street A T & T securities and that Eichler demanded $20,000 as evidence of good faith, which the defendant agreed to turn over, not to Eichler, but to Pata's father; and further, according to young Pata, his father told him that the following day he had received the money from Fassoulis.

The defendant states that before the trial he attempted, without success, to locate the Patas, father and son, and learned that the father had died prior to the trial; that it was not until August 1961, ten months after the trial, that he finally succeeded in locating the son. Pata, Jr. acknowledges he received a letter about a year and a half ago asking him to call on the defendant, but failed to do so. Delivery of the letter in normal course to Pata's new address indicates that had the defendant exerted diligent efforts to locate this former employee, he would have been successful.

Apart from the failure to show diligence, it is noted that when the Trial Judge at the time of sentence referred to the defendant's evasions as to the source of the bonds, his then counsel, with his consent, stated that the defendant had received the bonds from Pata, Sr.,[12] who at that time had been dead four years. Incidentally, this statement attributing the origin of the bonds to a dead man is in contradiction of the offered versions of Pata, Jr., the defendant and Broady.

Also on the subject of contradictions, it will be recalled that the Government's evidence included proof that the defendant, when he refused to identify the source of the securities, said that the suppliers of the bonds to whom he had been steered by a parolee had required him to put up $20,000 in cash as an indication of good faith under an agreement whereby they were to get 10% of the profits realized in any deal in which the bonds were used. The defendant's affidavit is silent on this subject. Pata, Jr. and Broady, however, refer only to $20,000 demanded by Eichler, and in addition differ as to who was to get this payment. Pata, Jr. states that the defendant agreed to turn it over to his father, whereas Broady says that Eichler required it be delivered to him. Reference is made to these inconsistencies and other matters since the quality of the claimed newly discovered evidence is relevant on the issue of whether upon a retrial an acquittal is likely.

The evidence of the fourth witness, Basil Estreich, is tendered to corroborate the testimony of Matthew Fox—the sole witness called by the defendant—to the effect that Fassoulis in Liftig's presence had said that he was not interested in the latter's four companies since they would only serve to clutter up Continental, thus tending to negate the charge of attempting to defraud Liftig by a scheme to merge the four companies with Continental.

■ The Trial Judge found Fox's testimony "unsatisfactory" in many respects.[13] Estreich, Fox's attorney, was present when Fox testified. Significantly, Estreich, as well as the defendant, heard Fox say that Estreich was more familiar with some details of their transactions and that he also had been present at several meetings with Liftig and the defendant when the latter is supposed to have disavowed interest in Liftig's four companies. In spite of this, the defendant, in explanation of his failure to call Estreich as a witness, states he did not recall Estreich's presence at those conferences. Apart from the fact that this explanation taxes credulity, certain it is

---

12. Appendix, Defendant's Brief on Appeal 370a–71a, United States v. Fassoulis, 293 F.2d 243 (2d Cir. 1961).

13. United States v. Fassoulis, 293 F.2d 243, 247 (2d Cir. 1961) (Appendix).

that Estreich was available to testify and at best his testimony is cumulative in support of a witness whose credibility was found wanting by the trier of the fact. Moreover, even if the defendant's excuse that he had no recollection of Estreich's presence at the conference, questionable as it is, were accepted, this lapse of memory does not entitle him to a retrial.[14]

Finally, this review of the so-called new evidence abundantly establishes that it is of such a nature that even were a retrial to be granted, it is extremely unlikely an acquittal would result.

The motion is denied.

14. United States v. Rutkin, 208 F.2d 647, 650 (3d Cir. 1954).