USA v. Mark Henry                          CR-95-20-B      03/13/97

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

United States of America

    v.                                             CR-95-20-01-B

Mark O. Henry


**O R D E R**

Mark O. Henry was convicted of one count of mail fraud, three counts of wire fraud, and one count of conspiracy to transport hazardous waste to a facility without a permit.  Henry moves for a new trial based on newly discovered evidence.  For the reasons that follow, I deny the motion.


**I.  BACKGROUND**

Mark Henry owned and operated Cash Energy, a corporation with offices in North Andover, Massachusetts.  Cash Energy operated numerous affiliated businesses, including Beede Waste Oil ("Beede"), located primarily at Kelly Road in Plaistow, New

Hampshire. Henry directed the affairs of both Cash Energy and Beede. Robert LaFlamme, an indicted co-conspirator who testified against Henry, managed Beede and oversaw its day-to-day operations.

Beede applied to the New Hampshire Department of Environmental Services ("NHDES") in March 1990 for a permit to recycle virgin petroleum contaminated soil[1] into cold mix asphalt. The recycling process required the use of a "pug mill" to mix contaminated soil with gravel and asphalt emulsion. Beede eventually obtained the permit in July. However, the permit capped the amount of contaminated soil that could be stored at the site at 3,000 tons.

Beede entered into recycling contracts with several entities even before the permit was issued. Although the company sporadically recycled soil using a leased pug mill, the amount of contaminated soil stored at the site soon exceeded the permitted

---

[1] Virgin petroleum contaminated soil is soil contaminated with petroleum or petroleum products, petroleum sludge, and all liquid petroleum derived hydrocarbons, such as lubricating oil, heating oil, gasoline, kerosene, and diesel fuel. The definition excludes soil that is determined to be hazardous waste because it is contaminated with other chemicals or metals. Beede needed an NHDES permit because the recycling process emits air pollutants.

amount.  Eventually, the amount of unrecycled soil grew to as much as 19,000 tons and at no time after May 1990 did Beede ever have less than 3,000 tons of soil at the site.  By April 1991, Beede's failure to comply with the permit caused the New Hampshire Air Resources Division to issue an administrative order prohibiting Beede from accepting any more contaminated soil.  This order was superseded by a new permit issued in June 1991 that allowed Beede to begin receiving new soil only if it first recycled all of the soil that had accumulated at the site.  Although Beede engaged in a small amount of soil recycling after the June 1991 permit was issued, it continued to receive new contaminated soil at the site in violation of the permit terms.

At trial, Henry was convicted of one count of mail fraud (Count IV), three counts of wire fraud (Counts VII, VIII and IX), and one count of conspiracy (Count X).[2]  The mail and wire fraud counts charged that Henry participated in a scheme to defraud several of Beede's customers of money by falsely representing that Beede could lawfully receive and recycle the customers' virgin petroleum contaminated soil.  The conspiracy count charged

---

[2]  Henry was acquitted of five counts of mail fraud (Counts I, II, III, V and VI).

3

that Henry participated in a conspiracy to knowingly cause hazardous waste to be transported to a facility that was not permitted to receive such waste in violation of 42 U.S.C. § 6928(d)(1). The conspiracy charge was based on an incident in which Beede contracted with a customer to haul away and dispose of soil allegedly containing unacceptably high levels of lead and cadmium that had been removed from the Stoneham Laundry site in Lawrence, Massachusetts.

## II.  STANDARD FOR A NEW TRIAL

To demonstrate that he is entitled to a new trial because of newly discovered evidence, Henry must show that (1) the newly discovered evidence was unknown or unavailable to him at the time of trial; (2) the failure to learn of the evidence was not a result of his lack of diligence; (3) the new evidence is material, not merely cumulative or impeaching; and (4) the new evidence is so strong that an acquittal would probably result upon retrial. United States v. Levy-Cordero, 67 F.3d 1002, 1018 (1st Cir. 1995), cert. denied, 116 S. Ct. 1558 (1996); United States v. Natanel, 938 F.2d 302, 313 (1st Cir. 1991). Henry has the burden of proving each element of this test. United States

4

v. Slade, 980 F.2d 27, 29 (1st Cir. 1992). "For newly discovered evidence to warrant a retrial in a criminal case, the existence of the required probability of reversal must be gauged by an objectively reasonable appraisal of the record as a whole, not on the basis of wishful thinking, rank conjecture, or unsupportable surmise." Natanel, 938 F.2d at 314.

### III. "NEW" EVIDENCE RELATING TO THE SCHEME TO DEFRAUD (Counts IV, VII, VIII and IX)

Henry contends the following evidence requires a new trial because it demonstrates Henry's honest intention to lawfully recycle his customers' contaminated soil.

### A. Lawrence Interview and Page Concepts Manifests

The first piece of allegedly new evidence Henry presents is part of a report of an EPA criminal division interview of Paul Lawrence, a New Jersey contaminated waste broker, conducted in April 1996. Lawrence claimed in the interview that he had brokered several virgin petroleum contaminated soil jobs for Henry. He also described how Henry had sent a letter to one of his customers in New Jersey explaining that Leeward of New Jersey was Beede's agent and was authorized to sign the names of Beede's

employees in the signature blocks of disposal documents. Lawrence claimed that in accordance with Henry's instruction, he had signed Robert LaFlamme's name on several occasions. He also reported that other people would sign names other than their own to disposal documents. Lawrence also claimed that Henry had told him that he planned to open a pug mill in the New York/New Jersey area. Finally, he stated that at some point he had received a call from either Henry or LaFlamme who told him that Beede's facility was temporarily unable to receive any additional soil. Attached to the report are six non-hazardous waste manifests for one of the jobs that Lawrence had brokered which indicate that Beede refused to accept loads of soil on June 4 and 5, 1991 because the facility was temporarily closed.

The Lawrence report and its supporting materials fail to warrant a new trial for two reasons. First, although the report itself was not available to Henry prior to trial because it was not prepared until after Henry's trial, the information contained in the report was readily available prior to trial because according to the statement itself, Henry was well aware of the information contained in the report. Second, assuming that the information contained in the report is material, it plainly is

6

not so strong that it probably would result in an acquittal if the case were retried. The facts that (1) other people may have signed the names of Beede employees to disposal documents on jobs unrelated to the counts of conviction; (2) that Henry may have talked at one point about opening a recycling facility in another state; and (3) that Beede had refused to accept soil for recycling on two days in June 1991 do nothing to undermine the abundant evidence in the record of Henry's guilt.

## B. Martin Affidavit

Henry contends that a new affidavit from Donald Martin, a former Beede employee, provides new evidence about the amount of asphalt produced at the Beede site. I find that this evidence was available to Henry at trial and would not likely lead to an acquittal at retrial.

Martin's affidavit asserts that in the spring of 1991, he delivered 25 to 30 loads of asphalt emulsion from Chevron Corp. to Beede, an amount capable of producing up to 17,500 tons of cold mix asphalt. The government argued at trial that Henry's low production of asphalt demonstrated that he never intended to recycle soil accepted at the site. Martin's testimony, Henry argues, undermines the government's theory of that scheme because

7

it shows Henry's intent to produce much more cold mix asphalt than was actually produced.

Henry cannot demonstrate why this evidence was unavailable to him at trial through a reasonably diligent search. Henry clearly knew that Beede had purchased asphalt emulsion from Chevron. The government also provided Henry with records of asphalt emulsion purchased by Beede prior to trial. Even if these records failed to show that Beede purchased 25 to 30 loads of asphalt or were otherwise incomplete, nothing prevented Henry from subpoenaing records from Chevron to determine the exact amount of emulsion purchased by Beede. Furthermore, Donald Martin was on Henry's witness list and available to testify at trial. Henry knew the scope of Martin's duties at Beede and could have questioned him about his delivery of emulsion to Beede during his employment. That he failed to do so does not entitle him to a new trial. See United States v. Fassoulis, 203 F. Supp. 114, 120 (S.D.N.Y. 1962) (not granting retrial when defendant forgot that a person in the courtroom had potentially exculpatory information).

Even if Henry could show that Donald Martin's testimony that he delivered 25 to 30 loads of emulsion to Beede was new

8

evidence, it would not entitle him to a new trial. Evidence that Henry ordered additional material to produce more cold mix asphalt than the government contended he did is not sufficiently exculpatory to warrant a new trial. The government presented ample evidence of the amount of cold mix asphalt produced at Beede through Russell Sattler, president of United Retek, the company that rented the pug mill to Beede. Sattler stated that his crew worked only sporadically and eventually stopped making asphalt because Beede failed to provide the needed emulsion. Henry introduced Beede's own records to show that only 1780 tons of asphalt were produced with the United Retek pug mill. Henry also introduced checks that Beede had used to purchase emulsion from Chevron that were returned for insufficient funds. Standing alone, without documentation to support it, Donald Martin's testimony that he delivered 25 to 30 tons of emulsion to Beede cannot overcome the evidence which suggests that Beede produced less than 6,000 tons of asphalt and left over 19,000 tons of soil unprocessed at the site. Further, this evidence does nothing to undermine the other evidence demonstrating that Henry brought contaminated soil onto the Beede site after it had been ordered closed and he concealed the fact that Beede could not accept new

9

soil from his customers.

## C.  **Brewster Affidavit**

Henry argues that new information from James Brewster, the former Cash Energy service manager, mandates a new trial.  I find that this evidence was available at trial and that it is not likely to lead to an acquittal at retrial.

Brewster would testify at a new trial that one of the contaminated soil piles at the site contained approximately 6,750 tons of soil removed from the Harvey Roberts tank truck spill at the site on November 21, 1991 rather than soil obtained from Beede's customers.  This testimony, Henry contends, would refute the government's argument that most of the unprocessed soil at Kelly Road came from off-site.

Henry, however, does not explain why this evidence was unavailable at trial.  Presumably, Henry knew of the Harvey Roberts spill and he should have known of the extent to which Brewster would be able to testify as to the location of the soil contaminated as a result of an on-site spill.  James Brewster was called as a witness and testified at trial.  Henry failed to elicit testimony from Brewster that should have been known through a reasonably diligent search and thus Brewster's

affidavit cannot result in a new trial.

Again, even if Henry could demonstrate that Brewster's information was indeed new, it would not likely have changed the outcome at trial. The government's evidence concerning the amount of soil accepted at the Beede site was based only in small part on the amount of soil located at the site on any particular date. The government introduced documentary evidence that was produced contemporaneously with the acceptance of off-site soil to Beede, and this documentary evidence was supported by live testimony given by those with knowledge of contaminated soil deliveries to Beede.

## D.   **Wickson documents**[3]

Henry also presents documents from Wickson Trucking, Inc. that he contends entitle him to a new trial. These documents detail the screening of soil at the Beede site by Wickson Trucking, Inc. These documents, he argues, demonstrate Henry's intent to resume soil recycling operations once he had complied

---

[3]   Henry also presents a letter he sent to Charles Eiras discussing the shipment of soil to Norridgewock. These shipments were the subject of Count V, of which Henry was acquitted, and are not helpful to his argument for a new trial. In any case, since Henry obviously knew about the information in the letter he wrote, it cannot be considered "new" evidence.

11

with applicable state and local regulations.  Henry, however, cannot demonstrate that this evidence was unavailable at trial through the results of a reasonably diligent search.  I also find that this evidence is cumulative and is not likely to result in acquittal upon retrial.

The government provided Henry with six of the ten Wickson invoices during discovery.  The defendant could have obtained any remaining invoices through subpoena.[4]

Evidence of Henry's intent to resume soil recycling was presented at trial through the testimony of Newton Strickland, making the Wickson documents cumulative.  Also, soil screening is referenced in a number of government exhibits.  The June 11, 1991 amended permit issued to Beede Waste Oil makes reference to an 8800 cubic yard screened pile of virgin petroleum contaminated soil.  This pile would correlate to the Wickson screening records

_____

[4]  Henry was also provided, in pretrial discovery, a copy of a tape recording on which he states to a state representative that Beede had sifted "a ton of dirt."  If taken literally, this statement has little meaning, since a ton of dirt is relatively small amount.  Taken figuratively, however, this statement demonstrates Henry's knowledge of the extent of sifting taking place at Beede.  Because I find that at least some of the Wickson documents were actually provided in discovery and that the rest were available, I need not delve into what Henry might have meant by this remark.

for March and April of 1991.  Also, Henry's June 11, 1991 letter to the New Hampshire Air Resources Division notes his intent to process a screened soil pile.  Finally, the Beede daily reports contain references to screening by Wickson and others between April and November of 1991.  Therefore, the Wickson invoices do not materially add to the evidence presented at trial.

Evidence of additional screening by Wickson is also not sufficiently probative of Henry's innocence to warrant a new trial, for I cannot conclude that it would likely have led to acquittal had it been introduced.  Evidence of screening soil in preparation for recycling does not lead to the conclusion that recycling actually took place, and substantial evidence was produced at trial to support the government's contention that less than 6000 tons of asphalt were produced by soil processing. Henry presented other evidence that he was preparing to recycle soil, such as his litigation with the town of Plaistow, his efforts to obtain a pug mill, and his statements to state officials.  The government argued that this evidence was merely an attempt by Henry to create the false impression that recycling would take place, and the jury apparently accepted this argument, rejecting the good faith defense on which they were instructed.

13

In summary, all of the allegedly new evidence Henry cites concerning the mail and wire fraud charges was either known to Henry at the time of trial, was discoverable if Henry had exercised due diligence, or was cumulative of evidence presented at trial. Moreover, the "new" evidence, even when considered collectively, would be unlikely to result in an acquittal if a retrial were ordered. Accordingly, I reject Henry's motion for a new trial on the mail and wire fraud counts.

## IV. "NEW" EVIDENCE RELATING TO CONSPIRACY (Count X)

Henry argued at trial that he was not guilty of the conspiracy charge because the soil from the Stoneham Laundry site did not qualify as a hazardous waste. He also claimed that even if the soil was a hazardous waste, he was not guilty of the conspiracy charge because he honestly believed that the soil was non-hazardous.

Federal regulations provide that a solid waste is hazardous if, using the toxicity characteristic leaching procedure test method ("TCLP"), extractions from a representative sample of the waste contain lead in concentrations greater than 5 parts per million (5 mg/L) or cadmium in concentrations greater than 1 part

per million (mg/L).  40 C.F.R. §§ 261.3(a), 261.20, 261.24 (1991).  TCLP tests performed on the soil before it was removed from the Stoneham Laundry site indicated that the soil contained unacceptably high levels of lead and cadmium.  In an effort to respond to evidence suggesting that Henry was apprised of these test results before he authorized Beede to accept the soil, Henry attempted to rely on other tests later conducted on the soil at his direction by Beede's own laboratory.  Beede failed to detect hazardous levels of lead or cadmium in the soil using a test method known as the "3040 test".  The government countered this evidence by calling an expert witness employed by the New Hampshire Department of Environmental Services who testified that the 3040 test method was not acceptable for determining whether contaminated soil contained high levels of lead or cadmium.  Henry now points to two pieces of allegedly new evidence to support his defense to the conspiracy charge.

A.    **Sanborn, Head, and Associates March 1996 Report**

On March 28, 1996, Sanborn, Head & Associates ("SHA"), a consultant working for the State of New Hampshire, released a report preliminarily assessing various remedial alternatives for the contaminated soil remaining at the Beede site.  An appendix

15

to the report contains copies of test results conducted by Beede's laboratory that used the 3040 test method. Henry argues that the SHA report is important new evidence because it demonstrates that the state's environmental consultant relies on the same 3040 test method that Henry claims he relied on in concluding that the soil removed from the Stoneham Laundry site was non-hazardous. Although I agree that the SHA report is new evidence, I find that this evidence is impeaching and cumulative and is not sufficiently probative to warrant a new trial.

The government does not dispute that the inclusion of 3040 test results in the SHA report constitutes new evidence, but argues that the inclusion of the test results does not demonstrate the state's reliance on those tests. Henry has submitted no direct evidence to support his claim that either NHDES or SHA relied on the 3040 test results included in the SHA report. Thus, I am asked to infer this reliance from the bare inclusion of the documents in the appendix of the SHA report.

The SHA report itself sheds little light on the extent of SHA's reliance on the 3040 test results. These test results were all produced by Beede's own laboratory. SHA included these analyticals in Appendix C of its report. Appendix C is

referenced on pages 3-4 of the SHA report under the heading "Soil Pile Descriptions" which states: "Analytical results provided by NHDES for soil collected from piles Nos. 5A, 5B, 8, and 10 are included in Appendix C." Appendix C itself consists mainly of numerous test results from Chem Test Lab, apparently ordered by NHDES. In addition to the Chem Test results, there are four test results produced by Beede's laboratory which analyze halogens using the 9020 method, TPH using the GCFID method, and metals levels using the 3040 method. Although these test reports are included in Appendix C, it is unclear to what extent, if any, they were relied upon by SHA. Henry's contention, therefore, that the state relied on his 3040 test analyticals in its assessment of the Beede site's contamination is, at best, uncertain.

Even assuming Henry could show that the state relied on Beede's 3040 test analyticals through the SHA report, Henry cannot show that this new evidence is material. Henry bases his argument that the SHA report justifies a new trial mainly on the grounds that it would have assisted him in his impeachment of the testimony of Michael Wimsatt. This new impeachment evidence is not probative enough to suffice as grounds for a new trial. See

17

Pelegrina v. United States, 601 F.2d 18, 21 (1st Cir. 1979) ("impeaching evidence is generally treated as immaterial" on motion for new trial).

Finally, even if the SHA report demonstrated that the state relied on the 3040 test and that Henry may also have been justified in relying upon it himself, I cannot conclude that the jury would likely have acquitted Henry if it had been presented with this new evidence. At trial, the government's evidence was not just that Henry mistakenly used the 3040 test as opposed to the TCLP test, but that Henry was provided with TCLP test results showing the soil he was about to transport was hazardous. The likely inference from these facts is that Henry used the 3040 test to convince his customers that the soil was not hazardous and could be accepted at the Beede facility. All these machinations were performed as a part of a scheme whereby Henry agreed to transport soil from New Jersey to a hazardous waste facility in Michigan, but actually had no intention of doing so. Instead, he transported the soil to the Beede facility, dumped it there and then performed the 3040 tests. Henry showed these new test results to his customer in an attempt to convince it that the soil was acceptable for recycling at the Beede facility.

Henry's effort to show that he might have reasonably relied on the 3040 test results is unlikely to overcome this evidence of willful deceit.

B.  **Opinion of Steven Kurz, Ph.D.**

Lastly, Henry presents an affidavit from Dr. Steven L. Kurz whose testimony, he contends, would have shown that the soil that the government contends was a regulated hazardous waste was exempt from regulation under the Code of Federal Regulations.  I find that this evidence was available at trial and that it is not sufficiently probative to likely result in an acquittal.

Henry fails to show why Dr. Kurz's testimony was unavailable and actually concedes in his motion that the information "may have been available prior to trial."  Henry argues, however, that the complexity of the case and the large and unwieldy nature of the evidence explains why Dr. Kurz's testimony was not available before trial.  While I agree that this case involved legally complex environmental issues, Henry has presented no authority, and I can find none, which would permit me to grant a new trial based on evidence that was available prior to trial, but was overlooked or not explored due to the complexity and multitude of other issues involved.  Any trial involves the prioritization of

19

arguments and the allocation of scarce resources. The fact that Henry and his counsel chose to marshal other evidence that they considered to be of higher priority than the evidence that they now present merely highlights the limited probative value of Dr. Kurz's proposed expert opinions.

Even if I were to consider Dr. Kurz's affidavit as "new," I conclude that its use at retrial would not likely result in acquittal. Dr. Kurz's conclusions are simply incorrect as a matter of law. For example, he asserts that any soil that is recycled into cold mix asphalt is exempt from regulation as a hazardous waste under 40 C.F.R. § 261.2(e)(1991), which states, in pertinent part:

> (e) *Materials that are not solid waste when recycled.* (1) Materials are not solid wastes when they can be shown to be recycled by being . . .
> (ii) Used or reused as effective substitutes for commercial products.

Dr. Kurz, however, fails to note the continuation of the regulation in § 261.2(e)(2):

> (2) The following materials are solid wastes, even if the recycling involves use, reuse, or return to the original process (described in paragraphs (e)(1)(i) through (iii) of this section):
> (i) Materials used in a manner constituting disposal, or used to produce products that are applied to the land . . .

20

Even a cursory reading of the regulation indicates that the recycling exception is inapplicable because asphalt produced from the recycling of contaminated soil through the cold mix process is a product "applied to the land." <u>See</u> Hazardous Waste Management System; Definition of Solid Waste: Summary, 50 Fed. Reg. 614, 628 (1985)(describing asphalt as a product applied to the land).

Dr. Kurz also contends that "[m]aterials accumulation [sic] speculatively"[5] are exempt from federal hazardous waste regulations under 40 C.F.R. § 261(e)(2), and that this exemption applies to soil stockpiled from underground storage tank removals. It is unclear how Dr. Kurz comes to this conclusion, for the regulation he cites specifically states that "materials accumulated speculatively" <u>are</u> solid wastes "<u>even if</u> the recycling involves the use, reuse, or return to the original process." 40 C.F.R. § 261.2(e)(2) (1991) (emphasis added).

Dr. Kurz's last assertion is similarly flawed. In his affidavit, he argues that 40 C.F.R. § 261.4(b)(10)(1991) excludes

---

[5] A material is "accumulated speculatively" if it is accumulated before being recycled. 40 C.F.R. § 261.1(c)(8) (1991).

21

from the definition of "hazardous wastes" soil contaminated with lead and cadmium, such as those at issue in this case. Section 261.4(b), however, reads, in pertinent part:

> (b) *Solid wastes which are not hazardous wastes.* The following solid wastes are not hazardous wastes: . . .
> (10) Petroleum-contaminated media and debris that fail the test for the Toxicity Characteristic of § 261.24 (Hazardous Waste Codes D018 through D043 only) and are subject to the corrective action regulations under part 280 of this chapter.

(emphasis added). The Waste Codes referred to are found at 40 C.F.R. § 261.24 (1991). Cadmium is waste code D006. Lead is waste code D008. Section 261.4(b)(10) only covers waste codes D018 through D043. Therefore, § 261.4(b)(10) does not cover lead and cadmium contaminated soil. Dr. Kurz's testimony on this point thus would be wholly irrelevant to the jury's deliberations, and does not warrant a new trial.[6]

---

[6] At trial, the jury was provided with a definition of hazardous waste as it was defined in the Code of Federal Regulations. I did not then and do not now believe that disagreements over the interpretation of the regulations are a question of fact for the jury. See Methow Valley Citizens Council v. Regional Forester, 833 F.2d 810, 815 (9th Cir. 1987) (noting that the interpretations of environmental regulations present a question of law to be reviewed de novo), rev'd on other grounds, 490 U.S. 332 (1989).

22

## V.  CONCLUSION

For the foregoing reasons, Henry's motion for a new trial (document no. 112) is denied.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

March 18, 1997

cc:  Bjorn Lange, Esq.
     Stephen R. Herm, Esq.
     Jeremy F. Korzenik, Esq.