IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 28, 2007 Session

## RONALD M. FLOYD, ET AL. V. PRIME SUCCESSION OF TN, ET AL.

**Interlocutory Appeal from the Circuit Court for Bradley County**
**No. V-02-621     W. Neil Thomas, III, Judge**

**No. E2006-01085-COA-R9-CV  - FILED AUGUST 13, 2007**

This lawsuit was filed by the husband and children of Gail Lavan Floyd, who died in March 2000. T. Ray Brent Marsh ("Marsh") and the company managed by him, Tri-State Crematory, Inc. ("Tri-State"), are the only remaining defendants. The instant case is one of many civil actions filed against Marsh and Tri-State following the discovery of over 300 bodies on the company's premises. The bodies were to have been cremated, but were not. Criminal charges were brought against Marsh in Georgia and Tennessee. He pleaded guilty to many of the charges. Following Marsh's sentencing, he was noticed, for the second time, to give a deposition in the instant action. At an earlier deposition, he had invoked his Fifth Amendment privilege against self incrimination. As to the present notice, the trial court concluded that Marsh could no longer invoke his Fifth Amendment privilege because, in the court's judgment, he is no longer facing criminal prosecution. The court ordered Marsh to give a second deposition and further ordered that he could not refuse to answer any question posed to him at the deposition if his refusal was predicated upon the Fifth Amendment. We granted Marsh's Tenn. R. App. P. 9 application for an interlocutory appeal. We affirm in part and vacate in part.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court
Affirmed in Part and Vacated in Part; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY and SHARON G. LEE, JJ., joined.

Stuart F. James, Chattanooga, Tennessee, for the appellant, T. Ray Brent Marsh.

William J. Brown, Cleveland, Tennessee, for the appellees, Ronald Floyd, Jeffrey Floyd, Michael Floyd, and Amanda Clark.

**OPINION**

I.

The relevant underlying facts and procedural history are essentially undisputed. Gail Lavan Floyd died on March 21, 2000. Buckner-Rush Funeral Home in Cleveland agreed to handle the funeral arrangements and agreed to have Mrs. Floyd's remains cremated. Her body was to be cremated at Tri-State, located in Noble, Georgia, a business that provided cremation services for funeral homes in Tennessee, Georgia, and Alabama. Marsh had been operating Tri-State since 1996.

This lawsuit was filed in July 2002. The plaintiffs sued various defendants,[1] including the funeral home, Tri-State, and Marsh. According to the complaint,

> [t]he [p]laintiffs placed the body of their loved one in the care of . . . [the funeral home] with the specific expectation that the body would be handled in the manner and method described and with appropriate care and dignity as had been represented to them. The funeral was held and the body was placed in the possession of the . . . [funeral home] for cremation with the full expectation and promise that their loved one's's [sic] remains would be returned to them after it was properly cremated. On or about April 4, 2000, the plaintiffs were advised that their loved one's's [sic] remains were at the funeral home and they could pick them up. This they did and received a black box which was represented to them by representatives of the . . . [funeral home] as being the remains of their loved one's [sic] and a copy of a death certificate that recites that cremation of the body was performed at the defendant Tri-State Crematory . . . .
>
> On or about, February 25, 2002, the plaintiffs became aware through the media that bodies had been discovered on the grounds of the "Crematory" and that an investigation was proceeding. Plaintiffs have taken the box that was given to them by the . . . [funeral home] and have been advised that the contents are adulterated materials and that therefore it could not be the remains of their loved one. To date, they have not been advised by the . . . [funeral home], the "Crematory" or the Georgia Bureau of Investigation where the body was disposed of or the manner it was disposed of.
>
> Plaintiffs have since discovered that Tri-State Crematory was an [unlicensed] facility that was in a substantial state of disrepair. A casual inspection would have disclosed to any reasonable person that the facility was not properly managed or operational with the

---

[1] The claims against Buckner-Rush Funeral Home and other defendants were settled. An agreed order of compromise and dismissal as to them was entered on November 9, 2005.

cremation chamber not able to be used. Instead of the bodies being disposed of consistent with the "Cremation and Disposition Authorization" attached as Exhibit B, bodies that were taken to the "Crematory" were buried in pits or mass graves on the property or placed in burial vaults or just dumped on the ground.

Between February and April, a massive investigation involving extensive digging on the grounds of the "Crematory" were conducted by the authorities of the State of Georgia, Walker County, and the Federal Government. Despite this massive undertaking, the plaintiffs [sic] loved one's body has not been recovered nor has . . . [the disposition of the body] been disclosed by either the authorities . . . [or] the defendants.

(Paragraph numbering in original omitted). The plaintiffs asserted various theories of recovery: "breach of bailment responsibility," fraud and/or negligent misrepresentation, intentional/negligent infliction of emotional distress, and a claim pursuant to the Tennessee Consumer Protection Act.

As discovery proceeded, the plaintiffs served Marsh with a notice to take his deposition. He filed a motion to quash, citing the likelihood of criminal charges being filed against him. The initial deposition of Marsh was taken on August 29, 2003. At the beginning of the deposition, Marsh's attorney made the following comments regarding the parameters of the deposition:

It is expected that due to the nature of the indictments that were handed down against Mr. Marsh yesterday, that Mr. Marsh will be taking the Fifth Amendment.

[Counsel for the plaintiffs] and I had a hearing with Judge Thomas yesterday in which we dealt with a motion to quash. It is my understanding that [the plaintiffs' attorney] is going to ask questions and that Mr. Marsh will be allowed to assert the privilege of the Fifth Amendment, and that at such later time upon [the plaintiffs'

————————————

attorney's] decision whether he wants the inference[2] to be taken or considered by the Judge or there are issues . . . that there's a waiver or a question that falls outside the parameters of the Fifth Amendment, we'll file the deposition transcript with Judge Thomas and . . . [we] will address those issue with Judge Thomas at such later time.

(Footnote added).

A grand jury in Georgia returned 787 criminal indictments against Marsh. Those charges subjected Marsh to a possible cumulative sentence of an astounding number of years: more than 8,000. The indictments pertained to over 200 bodies, the identity of which had been ascertained. In addition, there were 111 unidentified bodies that were not a part of the indictment. On November 19, 2004, Marsh entered into a negotiated plea agreement that was announced to and accepted by the Superior Court for Walker County, Georgia. Although not entirely clear from the record, it appears that, in the Georgia proceeding, Marsh pleaded guilty to: (a) 122 counts of burial service fraud; (b) 47 counts of making a false statement; (c) 179 counts of abuse of a dead body; (d) 439 counts of theft by taking; and (e) 2 counts of "criminal attempt – attempted theft by taking." The plea agreement, as announced by the district attorney general, provides, in relevant part, as follows[3]:

[The State of Georgia] would recommend in this case that the defendant be sentenced to serve twelve years in prison, that he shall also be given a concurrent term of probation of 75 years and that as

---

[2] The negative inference referenced by Marsh's attorney is discussed in the case of *Mitchell v. United States*, 526 U.S. 314, 328 (1999):

This Court has recognized "the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them," *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), at least where refusal to waive the privilege does not lead "automatically and without more to [the] imposition of sanctions," *Lefkowitz v. Cunningham*, 431 U.S. 801, 808, n.5, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977). In ordinary civil cases, the party confronted with the invocation of the privilege by the opposing side has no capacity to avoid it, say, by offering immunity from prosecution. The rule allowing invocation of the privilege, though at the risk of suffering an adverse inference or even a default, accommodates the right not to be a witness against oneself while still permitting civil litigation to proceed. Another reason for treating civil and criminal cases differently is that "the stakes are higher" in criminal cases, where liberty or even life may be at stake, and where the government's "sole interest is to convict." *Baxter*, 425 U.S., at 318-319, 96 S.Ct. 1551.

[3] Unless otherwise indicated, the only alteration from the transcribed plea agreement is that it has been changed from all capital letters.

-4-

a condition of probation that he pay a fine of 20 thousand dollars and that the payment of the fine commence within one year after his release from incarceration and that he pay the fine and attendant costs at the rate of one thousand dollars per year under the supervision of the probation officer and we would request that the defendant be directed to hand-write a letter of apology to be delivered to a designated representative for each of the identified remains in this case. The letters would be turned over to the probation office for mailing to their ultimate destinations. We would ask the court to direct the defendant to write a general letter of apology. These would not be due until six months after the commencement of the sentence itself.

The defendant would pay restitution to the State of Georgia in the sum of eight million dollars in the event that the defendant shall either directly or indirectly attempt to profit or benefit in any manner from any transaction arising out of the sale of his story, so to speak, regarding these events.

The defendant shall be on unsupervised probation after the final payment of any and all fines and court costs and the sentence shall be concurrent with any other sentence he may receive in the State of Tennessee arising out of this and the period of incarceration shall begin sometime after January 1st of 2005.

On January 7, 2005, in Tennessee, Marsh pleaded guilty in the Criminal Court for Bradley County to: (a) 1 count of theft of services between $1,000 and $10,000; (b) 7 counts of criminal simulation; and (c) 35 counts of abuse of a corpse. It appears that his prison sentence in Tennessee was for a total of nine years.[4]

In anticipation of Marsh's guilty pleas and sentencing in the criminal proceedings, the plaintiffs again filed a notice seeking to take Marsh's deposition. The deposition was scheduled for February 7, 2005. Marsh filed a motion to quash and for a protective order. In the motion to quash, Marsh noted that he had already been deposed in the Georgia class action as well as by the plaintiffs' attorney in the present case. Marsh added:

---

[4] As previously indicated, Marsh's conduct resulted not only in criminal proceedings in Georgia and Tennessee, but also in numerous civil lawsuits in addition to the present case. For example, there is an appeal pending before this Court styled *Akers v. Buckner-Rush Enterprises, Inc.*, No. E2006-01513-COA-R3-CV, which involves appeals from several other civil cases which were consolidated for the purpose of appeal. In addition, a class action lawsuit was certified in the State of Georgia. The Georgia class action lawsuit apparently was resolved contemporaneously with Marsh's guilty plea in Georgia.

[The plaintiffs' attorney took Marsh's deposition] in these cases. Mr. Marsh asserted the Fifth Amendment and . . . [the plaintiffs' attorney] has not filed a motion nor has he addressed whether the Fifth Amendment was appropriately taken by Mr. Marsh. . . . [Plaintiffs' attorney] had the opportunity to fully examine Mr. Marsh pursuant to rule 26.02 of the *Tennessee Rules of Civil Procedure*. There were no limitations placed on the areas of inquiry, and . . . [the plaintiffs' attorney] had the opportunity to ask Mr. Marsh any question relating to discovery, allowing Mr. Marsh to assert the Fifth Amendment, and then ask this court to address the issues regarding the Fifth Amendment.

* * *

[The plaintiffs' attorney] noticed the deposition because of Mr. Brent Marsh's guilty plea in Walker County, Georgia. . . .

The fact that a plea has been entered does not mean that the Fifth Amendment privilege is waived. If the court allows a second deposition, Mr. Marsh must assert his Fifth Amendment privilege or it is waived. Moreover, the court cannot address the issue of the assertion of the Fifth Amendment privilege until the question is posed and the privilege is asserted. . . .

The plaintiffs responded to the motion to quash by claiming that the Fifth Amendment could not be invoked because Marsh no longer faced criminal prosecution. Plaintiffs attached, as exhibits, Marsh's guilty pleas in Walker County, Georgia, and Bradley County. They also attached the affidavits of: (1) William H. Cox, III, the District Attorney General for the 11th Judicial District of Tennessee; (2) C. Michael Layne, the District Attorney General for the 14th Judicial District of Tennessee; (3) J. Michael Taylor, the District Attorney General for the 12th Judicial District of Tennessee; and (4) Mike O'Dell, the District Attorney General for the 9th Judicial Circuit of Alabama. All four of the district attorney generals have prosecutorial jurisdiction in counties where funeral homes are located which sent bodies to Tri-State for cremation. Each of the district attorney generals stated that he is satisfied with the results of the criminal prosecutions that took place in Walker County, Georgia, and Bradley County, and that he has no intention of bringing any additional criminal charges against Marsh.

The trial court denied Marsh's motion to quash and ordered Marsh to proceed with the deposition. The trial court's order states:

The court, having heard argument of counsel, on the defendants [sic] Motion to Quash the Notice of Deposition and Subpoena for Brent Marsh to testify, and after . . . hearing argument of counsel regarding

-6-

the Motion to Quash and the arguments regarding Mr. Marsh's constitutional rights under the Fifth Amendment of the United States Constitution, the court hereby:

ORDERS, ADJUDGES, and DECREES that the plaintiffs are permitted to take the deposition of Mr. Marsh and accordingly denies the Motion to Quash filed by Mr. Marsh by his attorneys. The court, further, orders that the deposition shall not be permitted until March 2006 as the court believes that the appropriate statute of limitations for any criminal charges will have expired by February 17, 2006. In light of the statute of limitations expiring, the court orders that the Fifth Amendment privilege is no longer available to Mr. Marsh in the context of these cases. *The court, therefore, orders that Mr. Marsh cannot take the Fifth Amendment privilege against self-incrimination as to any question in the deposition.*

(Emphasis added).

After the trial court ordered Marsh to give a second deposition and further ordered that Marsh could not assert a Fifth Amendment privilege "as to any question," Marsh filed a Tenn. R. App. P. 9 application for interlocutory appeal, which the trial court granted. We subsequently granted Marsh's application.

II.

Marsh raises the following issues, which we take verbatim from his brief:

Whether the trial court appropriately ordered the deposition of the defendant, Brent Marsh, based upon the trial court's conclusion that the statute of limitations for any criminal charges expire on a date certain[.]

Whether the expiration of the statute of limitations for criminal charges permits the court to enter an order that the Fifth Amendment privilege is no longer available to a person in a civil case before the party invokes the Fifth Amendment Privilege as to questions posed to that person.

Whether the trial court may order that a person cannot take the Fifth Amendment privilege under the Tennessee and United States Constitutions against self-incrimination as to any question in a deposition as ordered by the Hamilton County Circuit Court in its order of February 27, 2006.

(Footnote omitted).  Marsh also asks this Court to "consider whether ordering a second deposition [in this case] . . . is appropriate."

III.

In this non-jury case, our standard of review is *de novo* upon the record of the proceedings below.  Tenn. R. App. P. 13(d).  Since our decision in this case involves a pure questions of law, our *de novo* review is pursued with no presumption of correctness attaching to the trial court's conclusions of law.  **Campbell v. Florida Steel Corp.**, 919 S.W.2d 26, 35 (Tenn. 1996).

IV.

In **Hoffman v. United States**, 341 U.S. 479 (1951), the United States Supreme Court discussed the Fifth Amendment in the context of a federal prosecution.  What the High Court said would apply with equal force to a state prosecution:

> The Fifth Amendment declares in part that "No person * * * shall be compelled in any Criminal Case to be a witness against himself".  This guarantee against testimonial compulsion, like other provisions of the Bill of Rights, "was added to the original Constitution in the conviction that too high a price may be paid even for the unhampered enforcement of the criminal law and that, in its attainment, other social objects of a free society should not be sacrificed."  Feldman v. United States, 1944, 322 U.S. 487, 489, 64 S.Ct. 1082, 1083, 88 L.Ed. 1408.  This provision of the Amendment must be accorded liberal construction in favor of the right it was intended to secure.  Counselman v. Hitchcock, 1892, 142 U.S. 547, 562, 12 S.Ct. 195, 197, 35 L.Ed. 1110; Arndstein v. McCarthy, 1920, 254 U.S. 71, 72-73, 41 S.Ct. 26, 65 L.Ed. 138.
>
> The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. (Patricia) Blau v. United States, 1950, 340 U.S. 159, 71 S.Ct. 223.  But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer.  Mason v. United States, 1917, 244 U.S. 362, 365, 37 S.Ct. 621, 622, 61 L.Ed. 1198, and cases cited.  The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself - his say-so does not of itself establish the hazard of incrimination.  *It is for the court to say whether his silence is justified,* Rogers v. United States, 1951, 340 U.S. 367, 71 S.Ct. 438,

-8-

*and to require him to answer if "it clearly appears to the court that he is mistaken.*" Temple v. Commonwealth, 1880, 75 Va. 892, 899. However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, *it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.* The trial judge in appraising the claim "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." See Taft, J., in Ex parte Irvine, *C.C.S.D. Ohio,* 1896, 74 F. 954, 960.

**Hoffman**, 341 U.S. at 485-87 (emphasis added).

In **United States v. Townsend**, 139 F.3d 909 (Table), 1998 WL 80614 (9th. Cir. 1998), the United States Court of Appeals for the Ninth Circuit addressed the proper procedure to be employed with respect to the invocation of the Fifth Amendment privilege:

In *United States v. Pierce*, 561 F.2d 735, 741 (9th Cir. 1977), this court held that "[a] proper application of this standard requires that the Fifth Amendment claim be raised *in response to specific questions propounded by the investigating body. This permits the reviewing court to determine whether a responsive answer might lead to injurious disclosures.*"

**Townsend**, 1998 WL 80614, at *3 (emphasis added). In **North River Ins. Co. v. Stefanou**, 831 F.2d 484 (4th Cir. 1987), *cert. denied* 486 U.S. 1007 (1988), the United States Court of Appeals for the Fourth Circuit made a similar observation:

A party wishing in good faith to assert the privilege *must do so "with respect to particular [allegations]," thereby allowing the trial judge to determine the propriety of each refusal. General Dynamics Corp. v. Selb Manufacturing Co.,* 481 F.2d 1204, 1212 (8th Cir. 1973), *cert. denied,* 414 U.S. 1162, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974) (citing *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951)). The privilege also may be asserted and preserved in the course of discovery proceedings, Fed. R. Civ. P. 26(c), but in specifics sufficient to provide the court with a record upon which to decide whether the privilege has been properly asserted *as to each*

> *question.* *United States v. Gordon*, 634 F. Supp. 409, 418 (Ct.Int'l
> Trade 1986).

*Stefanou*, 831 F.2d at 487. (emphasis added)

As can be seen, the proper procedure to be utilized when the Fifth Amendment is invoked is for the question to be asked first. Then, if the Fifth Amendment privilege is invoked, the trial court is "to determine the propriety of *each* refusal."[5] *Stefanou*, 831 F.2d at 487 (emphasis added). In the present case, the trial court issued a *blanket* order directing Marsh not to assert a Fifth Amendment privilege "as to any question" that might be asked at the deposition. Such a broad prohibition would prohibit Marsh from asserting the Fifth Amendment privilege even with respect to potentially incriminating testimony regarding matters not directly related to the events at Tri-State.[6] This is not appropriate. We, therefore, conclude that the trial court erred when it entered, in advance of the second deposition, a blanket prohibition against the invocation of the Fifth Amendment privilege. The blanket prohibition is hereby vacated.

At this point in the litigation, we need not determine if Marsh can successfully assert a Fifth Amendment privilege, or, more specifically, whether Marsh has a reasonable belief that he could be prosecuted further. Those issues will need to be decided by the trial court when, and if, Marsh asserts a Fifth Amendment privilege with respect to specific questions. In the event this happens, the trial court will need to determine if a response by Marsh to any particular question might lead to an "injurious disclosure." *Hoffman*, 341 U.S. at 487.

When Marsh was initially deposed, the applicability of the Fifth Amendment to many of the questions was not in serious dispute because Marsh had been indicted the day before the deposition. Had the plaintiffs gone to the trial court at that time and challenged Marsh's invocation of the Fifth Amendment privilege, which they did not, Marsh certainly would have been successful. Now that Marsh has pleaded guilty to criminal charges in Georgia and Tennessee and has been sentenced, the landscape with regard to the Fifth Amendment *may* well be different. In other words, what may have been protected by the Fifth Amendment at the time of the first deposition may not now be protected.[7] Accordingly, the trial court committed no error when it ordered Marsh to give a second deposition, and we reject Marsh's claim to the contrary. This portion of the trial court's judgment is affirmed.

---

[5]Typically, the attorney taking the deposition will ask all of his or her questions; the privilege will be asserted as the deponent sees fit; the deposition will be transcribed; and all questions and assertions of the privilege will be presented to the trial court for its review.

[6] We do not mean to suggest that any such activity actually took place.

[7]We again emphasize that at this point in the proceedings, we express no opinion on the applicability of the Fifth Amendment to any potential question that may be posed to Marsh during a future deposition.

V.

The judgment of the trial court is affirmed in part and vacated in part, and this case is remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal are taxed to the appellees, Ronald Floyd, Jeffrey Floyd, Michael Floyd, and Amanda Clark.

_____
CHARLES D. SUSANO, JR., JUDGE